# Wytheville

## THE FEDERAL LAND BANK OF BALTIMORE V. WM. V. BIRCHFIELD.

June 12, 1939.

Record No. 2059.

Present, All the Justices.

The opinion states the case.

*George E. Allen, Peyton G. Jefferson* and *William Beasley,* for the plaintiff in error.

*L. Preston Collins* and *Stuart B. Campbell,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

This action, based on defamatory statements, was instituted by W. V. Birchfield against the Federal Land Bank of Baltimore. The trial court entered judgment for $1,500 on the jury's verdict for plaintiff. To that judgment defendant in the trial court obtained this writ of error.

Plaintiff began the action by filing a petition for an attachment, on the ground that the Federal Land Bank of Baltimore was a non-resident corporation. All the attachments that were served upon the different parties, alleged in the petition to be indebted to the Federal Land Bank of Baltimore, were dismissed. The trial court retained jurisdiction of the case on the ground that process had been served upon J. Henry Johnson, a director of the defendant corporation who lived in Scott county. The validity of the service of process upon him is attacked on two grounds; one, because it was not served by the officer to whom it was directed, and, two, because it was not served in accordance with Code, section 6063.

The process commanding the principal defendant to answer the petition, or state its grounds of defense, was di-

rected to the sheriff of Smyth county, the county wherein the cause of action arose. It was sent to the sheriff of Scott county, who made the following return: "Executed by delivering a true copy of the within attachment to John Henry Johnson, Director of the Federal Land Bank, there being no other agent of the Federal Land Bank of Baltimore being found in my bailiwick.

This March 6, 1937.

"J. E. QUILLAN, S. S. C."

On the return day named in the process, to-wit: April 26, 1937, defendant bank appeared specially, and made or presented numerous motions. The now pertinent motion was to dismiss the case because no valid service of process had been made and returned properly executed.

On the 26th day of March, 1938, some eleven months thereafter, plaintiff, over the objection of defendant, was given leave to have the sheriff of Scott county amend the return, which, as amended, is as follows: "Executed by delivering a true copy of the within attachment to John Henry Johnson, director of the Federal Land Bank of Baltimore, in my county of Scott in which county he resides, there being no other agent of the Federal Land Bank of Baltimore found in my bailiwick this March 6, 1937, J. E. Quillan, Sheriff, Scott County."

As this is "an action to recover damages for a wrong," process might have been legally executed in Scott county (or any county or city within the Commonwealth), although the action was instituted in Smyth county. "If it appear to be duly served and good in other respects, it shall be deemed valid although not directed to any officer, or if directed to an officer, though executed by some other person." Code, section 6055.

There is no merit in the contention that the process was invalid because directed to the sheriff of Smyth county and executed by the sheriff of Scott county. It is elemental that the courts are liberal in permitting officers to amend their returns to conform to the actual facts. Especially is this true when a casual and an honest mistake has occurred.

Defendant's next contention is that the Federal Land Bank of Baltimore is a domestic corporation, and hence service of process upon it is governed by the provisions of Code, section 6063.

The application of the provisions of this section is expressly limited to municipalities and "other corporations created by the laws of this state." Defendant is a corporation created by an act of the Congress of the United States, and authorized to do business in a number of States including Virginia. By the act of its creation it was empowered, "to sue and be sued, complain, interplead and defend, in any court of law or equity, as fully as natural persons." 12 U. S. C. A. section 676. While defendant corporation was created by another sovereign, and in that sense it is a foreign corporation, it has not appointed a statutory agent upon whom process may be served in this jurisdiction. This being true, process may be served upon it in accordance with Code, section 6064, providing: "If there be no statutory agent, the process or notice may be served on any other agent of such corporation in the county or city in which he resides or in which his place of business is. Service upon either (that is, the statutory agent or the resident agent), when duly made, shall constitute sufficient foundation for personal judgment against such corporation when the other requisites therefor exist."

John Henry Johnson, being a director of defendant corporation who resided in Scott county, was a proper person within the provisions of this statute upon whom process against the corporation could be legally served.

The Federal Land Bank of Baltimore is one of the 12 land banks of the nation created by the Federal Farm Loan Act of 1916, 39 Stat. 360. This bank, with its principal office in Baltimore, was organized for the purpose of loaning money, with farm land as security, in Virginia, West Virginia, Maryland, Pennsylvania, Delaware, District of Columbia and the island of Porto Rico. Originally loans were made almost exclusively through county national farm loan associations, authorized to be chartered under the farm

loan act, but as separate and distinct corporations with their own officers, boards of directors and secretary-treasurers.

Smyth County National Farm Loan Association was so organized for the purpose of submitting applications of its members for loans to the Federal Land Bank of Baltimore, such loans to be secured by a first mortgage on the farm land of the individual borrower. When a borrower secures a loan through this organization he is required to subscribe to stock in the association to an amount equal to 5 per cent of the amount of the loan allowed. The association in turn is required to take out a like amount of stock in the bank, which stock is retained by the bank as collateral to the loan which the association has endorsed. The borrower thus becomes a stockholder in his loan association, and the association becomes a stockholder for a like amount of stock in the bank.

When the stock of a loan association becomes substantially impaired by reason of losses, the bank is prohibited by the regulations of the Farm Credit Administration, which now has the supervision of all land banks, from making further loans through the association. The bank is permitted and does make direct loans through a Direct Loan Correspondent, appointed for that purpose, when the association, because of its losses, is unable to function. For several years prior to 1936 the capital stock of the Smyth County Association had become so impaired that it had become unable to accept applications for loans and, hence, loans in that territory were made by the bank through a local correspondent. However, the association remained in existence for the purpose of gradual liquidation, during which period it continued to assist in collecting the amortization payments and to make reports to the Federal Land Bank of Baltimore on the financial condition of borrowers.

W. V. Birchfield was the secretary-treasurer of the Smyth County National Farm Loan Association. He was an approved attorney for the Federal Land Bank of Baltimore to make abstracts and perform such other legal services as the Federal Land Bank might direct. He was also the Direct

Loan Correspondent through whom farmers in Smyth County might obtain money directly from the Federal Farm Loan co-operative system.

While it is one of the primary duties of the secretary-treasurer of the local association to collect and transmit to the bank amortization payments due by the members of the association, during the past ten years or more, delinquents had increased to such an extent that the bank sent numerous agents and representatives to visit different borrowers, to make collections and to report upon the conditions of the land covered by the mortgages held by it. The bank found by experience that collections and what it termed "servicing the loans" could be better accomplished through the local association than it could through independent agents sent from Baltimore. The loan associations have very little, if any, surplus money, and have practically no means of obtaining funds. As this work was important, the bank, from time to time prior to 1937, had allotted to the association limited sums with which to pay for this work.

In 1936 the directors of the bank adopted what they termed a "new allowance plan." The purpose of this plan was to place additional responsibility upon the associations to collect the amortization payments, inspect the lands, see that the taxes and insurance premiums were paid, and to furnish the bank with such other pertinent information regarding the borrowers and farms covered by the mortgages held by it, as the bank might require. Under this plan the compensation of the secretary-treasurer was considerably increased, as he would be required to do most of the work. Inasmuch as the bank was furnishing the compensation, one of the conditions imposed upon the associations was that the board of directors should elect a secretary-treasurer acceptable to the bank.

While the acceptance of this plan was optional with the association, it provided that no compensation would be made to an association unless "the association have in office at all times a competent secretary-treasurer whose qualifications met the approval of the bank." In order to determine the

qualifications of the secretary-treasurers of the 210 associations for the work under the new plan, a careful examination was made of the past records of each secretary-treasurer. The secretary-treasurers of some 72 of the associations were found to be unsatisfactory for the positions under the new plan. Plaintiff was one of the 72.

When the directors of the Smyth County National Farm Loan Association were advised that its secretary-treasurer, W. V. Birchfield, would not be approved by the bank under the "new allowance plan," and that the plan would not be made effective in Smyth county as long as such secretary-treasurer was retained in office, the directors passed a resolution refusing to accept the resignation of W. V. Birchfield as secretary-treasurer. The same resolution authorized him to "take up with the proper authorities and report to the directors of this association the following:

"1. The charges against W. V. Birchfield, as Secretary-Treasurer and the reason why his resignation is demanded and wherein, if at all, this association is failing or has failed to function in accordance with the purposes for which it was created.

"2. Whether or not the Federal Land Bank of Baltimore has shown the proper cooperation with the association and whether or not said Bank is co-operating to the best interest of the borrowers of the association."

Purporting to act under this resolution, the secretary-treasurer procured numerous affidavits derogatory to the various agents and representatives of the bank operating in Smyth county. All except one of these affidavits were executed in triplicate and copies sent to Congressman John W. Flannagan, Senator Harry F. Byrd and the third to the President of the United States. All three sets of affidavits eventually reached the bank in Baltimore.

The bank was requested to send a representative to attend the stockholders' meeting of this association held on the 12th day of January, 1937, to make an address on matters of mutual interest to the bank and the association. Representatives of the bank attended and at this meeting the stock-

holders elected directors for the ensuing year. The directors held a meeting after the stockholders had adjourned. The representatives then addressed the directors on the subject of the "new allowance plan." In the course of the discussion of this plan the affidavits procured by Birchfield were produced. All, except one signed by Robert Hayton, had been signed in triplicate. It appeared that Hayton had failed to sign all three copies of his affidavit, and Miss Lillian Fortune, an employee of William V. Birchfield, had written his name on one of the copies. There was no prefix to the signature indicating that the name was not signed by Hayton, himself. However, the word "copy" was typed in the upper left-hand corner of the affidavit. As the affidavits were fastened together, the word "copy" was not visible until the affidavit had been separated from the other papers to which it was fastened by a clamp.

The pertinent defamatory statements (hereinafter discussed in detail) are alleged to have been made by the bank in connection with its presentation of the "new allowance plan" to the Smyth County National Farm Loan Association.

With this background, which appears in the pleadings and the evidence, we examine plaintiff's pleading, which consists of an original petition for attachment, two amended petitions, and a bill of particulars. These petitions are attacked on several grounds, which will appear in the discussion to follow.

■ The original petition is very long, covering seven printed pages. It contains some allegations appropriate to a declaration in actions for insulting words under the statute, slander at common law, libel, and breach of contract or wrongful discharge, all in one count divided in several paragraphs. It presents a case of misjoinder of actions and duplicity. Over the objection of defendant, the original petition was twice amended, but neither amendment was filed within a year from the dates the alleged causes of action are alleged to have arisen.

The first question presented is whether the amendments state a new cause of action which is barred by the statute of limitations, or whether the amendments are simply an expansion or enlargement of a valid cause of action imperfectly stated in the original petition.

Plaintiff held and performed the duties of three distinct offices. Two of these positions, Direct Loan Correspondent and attorney for the bank, were held at the will of defendant. Hence, the bank had the right to discharge him from either or both of these positions with or without cause. Plaintiff held the third position, not by an appointment from the bank, but by an election or appointment by the directors of the association. While it was for the mutual interest of both corporations for the secretary-treasurer to work in harmony with the bank, still the bank had no legal right, without cause, to insist upon his removal as secretary-treasurer of the local association. While the basis of this action is for defamation, the allegations of the legal rights of the bank and the association to employ and discharge plaintiff from the respective positions are so intermingled in plaintiff's pleadings that they tend to confuse the issues.

The trial court, after the introduction of evidence, denied plaintiff the right to recover for his alleged wrongful discharge as Direct Loan Correspondent, or as attorney for defendant. The court should have made the same ruling on the pleadings prior to the introduction of any evidence, as the allegations in none of the petitions on this phase of the case state a good cause of action. These allegations, and any evidence introduced in support thereof, tend to create in the minds of the jury sympathy for plaintiff on account of the fact that he had lost two lucrative positions, but if he were wrongfully discharged he should have alleged in a proper action sufficient facts to show this. If he was not wrongfully discharged, the fact that he lost the positions has no bearing upon the charge of defamation, unless there was some connection between the defamation and the discharge. This connection is not properly shown in the pleadings. It follows that we are of opinion that the trial court

should have sustained defendant's motions numbered 6, 7 and 8, which were to strike from the petitions the specific superfluous matters stated therein.

This leaves for consideration only that part of the original petition alleging defamation. The exact allegation of the basic facts in the original and amended petitions, with the innuendoes and other descriptive words omitted, are stated below in parallel columns:

| *Original Petition* | *Amended Petitions* |
|---|---|
| " * * * defendant, * * * on the day of November, 1936, * * * spoke * * * concerning the said plaintiff * * * , stating among other things * * * that he, the said plaintiff had by the said principal defendant been summarily requested to resign and had resigned and or would resign * * * from his said responsible positions * * * and that he would be removed." | "The Bank * * * is getting rid of * * * Birchfield * * * is letting him * * * go * * * ." |
| " * * * defendant * * * charged that said plaintiff * * * had forged the name of one Robert Hayton to a certain affidavit * * * . The said principal defendant * * * further stated that written affidavits prepared by the said plaintiff * * * of Mrs. J. M. Gass and others, did not have the genuine signatures of the affiants thereon * * * ." | "These affidavits * * * which Birchfield * * * has taken * * * Will have to be taken out of Washington, * * * the Bank * * * will not accept these affidavits. These affidavits * * * are not genuine * * * the Bank * * * does not want to prosecute Birchfield * * * ." |

The two basic allegations of fact were that defendant falsely stated (1) that plaintiff had been removed or had resigned as secretary-treasurer of the National Farm Loan Association; and (2) that he had been guilty of forging the name of Robert Hayton to an affidavit, and of using the affidavit of one Mrs. J. M. Gass which did not bear her genuine signature.

■■ The allegations in the original petition do not purport to contain the exact words charged to have been used by defendant, which is necessary to correctly state a good cause of action for libel, slander or insulting words. Good pleading requires that the exact words spoken or written must be set out in the declaration *in haec verba*. Indeed, the pleading must go further,—that is, it must purport to give the exact words. Not only must the exact words be charged, but they must be proven, or at least a sufficient number proven to make out a good cause of action. Words equivalent or of similar import are not sufficient. They must be substantially proven as alleged. Burks Pl. & Pr., 3d Ed., page 271.

The defendant contends that the case is controlled by *Irvine* v. *Barrett*, 119 Va. 587, 89 S. E. 904, Ann. Cas. 1917C, 62. The action in that case was for slander at common law. The original declaration purported to set out the defamations *in haec verba*, but they were not actionable *per se*. The words were: "The business is short about $1,500.00 which I have never been able to account for; meaning thereby to charge that plaintiff in his conduct of the mercantile business aforesaid had been guilty of fraudulent, dishonest and dishonorable conduct * * ." The amended declaration, filed more than a year from the date the cause of action arose, contained the following: "He beat me out of $1,000.-00 to $1,500.00. He tried to steal $1,200.00 from me. He failed to account to me for $1,000.00 which I put in the business."

It will be noticed that the exact words set out and quoted in the original declaration were not actionable *per se*, and

that those set out in the amended declaration were actionable *per se*.

In the discussion of the case, it is stated in the opinion that the words imputed to defendant in the amended declaration were not known to plaintiff until a year after the action was instituted. The court said: "Indeed, the words imputed to the defendant in the second count were not even known to the plaintiff until the year following the bringing of the original action. It would seem plain on principle that no matter on how many separate occasions one may utter slanderous words about another (though all may refer to the same transaction) each slander constitutes a new cause of action. *A fortiori* must that be true where the subsequent slanderous words are essentially different from those spoken in the first instance, and on another occasion, and to another person. In such case if separate suits are brought on the several causes of action, the judgment in one cannot be pleaded in bar to the other.

" 'It has been declared to be a fair test in determining whether a new cause of action is alleged in an amendment, to inquire if a recovery had upon the original complaint would be a bar to any recovery under the amended complaint, or if the same evidence would support both, or if the same measure of damages is applicable, or if both are subject to the same plea * * * . Amendments which only amplify the statements or prayer in the original complaint are not deemed to introduce a new cause of action.' 1 Ency. Pl. & Pr. 556, 557."

In the case at bar, the first petition for the attachment stated that (1) plaintiff claimed the specific sum of $3,000, (2) this sum was due plaintiff as damages for defamation, and (3) the defamation consisted in falsely stating that plaintiff had forged the name of Robert Hayton to an affidavit and had used an affidavit of Mrs. J. M. Gass which did not bear her genuine signature.

█ It is true that the original petition did not state the specific day or occasions on which the statements were made, nor did it contain the names of agents or representatives

of defendant corporation who made the statements, nor the names of the persons to whom they were made. In addition, it was defective in that it did not purport to give the exact words claimed to have been used by defendant, but it did state a substantial cause of action imperfectly. Mere details, such as the time, the place, the names of defendant's agent and the names of the parties to whom the slander was published or communicated, were given in a bill of particulars. While it is better pleading to state these in plaintiff's original pleading, when such details are not set forth in such pleading, they are proper matters to be stated in a bill of particulars, which was done in this case.

The original petition names the person, whose signature defendant falsely accused plaintiff of forging, and the instrument to which the name was forged.

An examination of the four pleadings, three petitions and a bill of particulars, filed by plaintiff, without reference to the evidence, reveals that all of them refer to identically the same statements, to the same occasions and to the same charge of forgery made to the same parties in the course of one discourse.

In *New River Mineral Co.* v. *Painter,* 100 Va. 507, 42 S. E. 300, the action was for tort, and the original declaration charged the defendant with doing a lawful act negligently. The amended declaration charged defendant with doing an unlawful act. Objection was raised on the ground that the amended declaration stated a new cause of action. Judge Buchanan, speaking for the court and to the point, said: "If the plaintiff in the amended declaration is attempting to assert rights and to enforce claims arising out of the same transaction, act, agreement or obligation, however great may be the difference in the form of liability as contained in the amended from that stated in the original declaration, it will not be regarded as for a new cause of action. In such cases, the original and amended declarations and the count or counts in each are regarded as variations in the form of liability to meet the possible scope and varying phases of the testimony, which is one of the very objects

and purposes of adding several counts, and of making amendments to a declaration."

There are a number of Virginia cases in which this principle is approved. *Wise Terminal Co.* v. *McCormick,* 107 Va. 376, 58 S. E. 584; *Bowman* v. *First National Bank,* 115 Va. 463, 80 S. E. 95; *P. Lorillard Co.* v. *Clay,* 127 Va. 734, 104 S. E. 384; and *J. Aron & Co.* v. *C. & O. Ry. Co.,* 153 Va. 691, 151 S. E. 126.

In *Houston* v. *Lynchburg Traction & Light Co.,* 119 Va. 136, 89 S. E. 114, Judge Kelly, speaking for the court, said: "We think there is no merit whatever in this contention, as there is no material difference between the original and the amended declaration; the amendment being merely an amplification of the original upon points as to which the fuller details given therein were to the advantage and not to the prejudice of the defendant."

In *Watson* v. *Brunner,* 128 Va. 600, 105 S. E. 97, Judge Saunders, speaking for the court, said: "The authorities agree that a substantive cause of action, or a new cause different from that declared on in the original action, can not be introduced by amendment. But as Judge Burks says in *Hurt* v. *Jones,* 75 Va. [341], 353, 'it may be difficult under the adjudications to state what is to be regarded as a new case within the meaning of the rule.' * * * .

"The rule forbidding the introduction of an absolutely new cause, as applied to a situation falling within its terms, is a sound one. We have not reached the point that a plaintiff who loses an action for damages for malicious injury, will be allowed by amendment to institute an action of ejectment against the defendant."

In *E. I. Du Pont, etc., Co.* v. *Snead's Adm'r,* 124 Va. 177, 187, 97 S. E. 812, 814, it is said: "Amendments are freely allowed and are to be favored when they promote the ends of justice. It would be a reproach to the administration of justice to permit a substantial right to be sacrificed to a mere form which did not affect the rights of the parties or the mode of procedure, and which could be readily changed without injury or injustice to any one."

██ Defendant contends that an injustice would be done it if the amended petitions are permitted in this case, in that it would be denied the right of pleading the statute of limitations. This contention would be sound if the amendment stated a new cause of action, but the petitions reveal that the original pleading stated a good cause of action imperfectly, and that the second amended petition stated no new cause of action but correctly stated a good cause of action which had been imperfectly stated in the original petition. In this connection, see Code, section 6104; *Kennedy* v. *Mullins*, 155 Va. 166, 154 S. E. 568; *Ropp* v. *Stevens*, 155 Va. 304, 154 S. E. 553; and *Lough* v. *Lyon, Inc.*, 168 Va. 136, 190 S. E. 290.

Our conclusion is that the trial court did not abuse its discretion in permitting plaintiff to file his amended pleading, alleging that defendant had falsely stated that plaintiff was guilty of forging the name of Robert Hayton.

The next pertinent assignment of error is to the action of the court in refusing to set aside the jury's verdict on the ground that there was not sufficient evidence to sustain it.

The defendant bank was acting well within its rights when it adopted the "new allowance plan" for servicing its loans throughout the large territory in which it is engaged in doing business. It had the right and it was its duty to inform each and every one of the 210 county associations of the new plan with the conditions thereto attached. It had the right and it was its duty to make any changes in the personnel of its loan correspondents and attorneys as, in its judgment, it deemed best for the conduct of its business.

██ Its representative, E. W. Ligon, was carrying out the policy of the defendant when he consulted another attorney in Smyth county and told him of the plans of the bank and its determination to submit to the Smyth County National Farm Loan Association the "new allowance plan," and that if the new allowance plan was adopted the association would have to employ a secretary-treasurer other than plaintiff. This was a privileged communication and

the trial court was clearly right in holding, as a matter of law, that the privilege was not abused and that there could be no recovery because of the statement by Ligon that "the bank is getting rid of Birchfield—is letting him go."

The only remaining charge of defamation is the statements alleged to have been made by C. W. Held, assistant secretary of the bank, at the meeting of the directors of the Smyth County National Farm Loan Association held on January 12, 1937. Plaintiff knew, prior to this meeting, that the additional compensation, or additional allowance, for the Smyth County National Farm Loan Association would not be made so long as he continued to act as its secretary-treasurer. He must have been fairly well advised as to the reasons therefor. This appears in part from his letter to I. P. Whitehead, the general counsel, under date of December 21, 1936, and Whitehead's reply of December 29, 1936. Birchfield's letter to Whitehead reads as follows:

"I thank you for your letter of December 16, 1936.

"I think you have misunderstood me in stating that I will not take your advice. I appreciate your advice and have earnestly endeavored to act in accordance with your advice. I have again resigned as Secretary-Treasurer of the Smyth County National Farm Loan Association and have submitted this resignation to the Board of Directors. The Board of Directors will not accept my resignation and they have advised me that they have carefully observed the operation of the association by me and that they take full responsibilty for the manner in which the association has been conducted by me. The officers and directors of the association are of the opinion that the steps taken by them to avoid foreclosures and to obtain the best possible price for distressed real estate is to the best interest of the stockholders. They further state that in their opinion the entire availability of credit through the Federal Land Bank system depends upon their management of the association and that they are not willing to have the entire management of the association dictated by the Federal Land Bank of Baltimore.

"I believe that the reason that you and I do not understand each other is that the Bank is not here on the ground where it can understand the situation in these different matters. I believe if you can get the proper information into the proper department at the Bank that it will function and the failure to do this is the cause of the Bank's antagonistic attitude towards this association."

Whitehead replied:

"I am in receipt of your letter of December 21st which I have carefully noted.

"I am quite certain that the Bank entertains no hostile attitude towards the Smyth County National Farm Loan Association but, on the contrary, desires to help the Association in every way possible, but it will decline to make the allowance with reference to the support of the Association so long as you are its secretary-treasurer for the reason that the Bank is satisfied that it is not for the best interests of the Bank or the association that you continue in said office.

"I am turning your letter over to Mr. Jackson, President of the Bank."

Prior to the meeting of the directors of the Smyth County National Farm Loan Association on January 12, 1937, each litigant had discussed his different points of view without unduly trespassing on the legal rights of the other. Hence, plaintiff's right to recover is limited to the defamatory statements alleged to have been made by the bank through C. W. Held, its assistant secretary, at this meeting. The petitions state, and the testimony of several of plaintiff's witnesses establishes, that the defendant, by Held, on this occasion uttered these exact words: "These affidavits which Birchfield has taken will have to be taken out of Washington, the bank will not accept these affidavits. These affidavits are not genuine—the bank does not want to prosecute Birchfield."

These words were uttered in a discussion of the affidavits, which pertained to the business of the bank, between the bank's representatives on the one hand, and the secretary-treasurer and the directors of the local association on

the other. It was a privileged communication and uttered by an agent of the bank on a privileged occasion. This being true, plaintiff is entitled to recover only in the event that he proves the words were spoken with malice.

[14] "Although strong or violent language, disproportioned to the occasion, may raise up an inference of malice, and thus take away the privilege that otherwise would attach to it, still when the occasion is privileged, the tendency of the courts is not to submit the words to too strict a scrutiny, but rather to view them in the light of the facts as they appeared to the defendant; for the question is, not whether the imputations are true, but whether the words are such as the defendant might have honestly employed under the circumstances. *Strode* v. *Clement*, 90 Va. 553, 19 S. E. 177; *Brown* v. *Norfolk & W. Ry. Co.*, 100 Va. 619, 625, 42 S. E. 664 [60 L. R. A. 472]; *Rigney* v. *W. R. Keesee & Co.*, 104 W. Va. 168, 172, 139 S. E. 650 [54 A. L. R. 1139]." 6 Digest Va. & W. Va. Reps. 754.

It is conceded that the words were spoken in connection with a discussion of the affidavit of Robert Hayton. It is further conceded that the signature on the affidavit was not that of Robert Hayton. In that sense it was not genuine. It was a copy of an affidavit, the original of which did bear his genuine signature. A careful inspection of the paper itself showed that it was a copy. The only exact words that intimate a criminal offense are, "the bank does not want to prosecute Birchfield," preceded by the statement that the signature on the affidavit was not genuine. The jury could only find a verdict against the bank in the event that they considered this language so strong, violent or disproportioned to the occasion that its use, under the circumstances, convinced them that Held, in uttering the words, was actuated by malice toward the plaintiff.

[16] "Generally, of course, malice is a question of fact to be submitted to a jury, but where the communication is privileged, unless there is evidence from which a jury may fairly conclude that there was malice, there can be no

recovery." *Chalkley* v. *Atlantic Coast Line R. Co.*, 150 Va. 301, 306, 143 S. E. 631, 632.

Plaintiff's case on an essential point, of which he has personal knowledge, and concerning which he testifies, can be no stronger than his testimony makes it. On the vital question of malice he said: "Held has been very friendly to me * * *. I don't think Mr. Held ever had any malice toward me." He was asked, "You thought the circumstances were such that nothing would be thought of it?" His reply was "Certainly, between Held and myself."

On January 13, 1937, the day after he had been so grossly insulted (as he claims) by Held as an agent of defendant, he wrote the following letter to Held.

"I am enclosing herewith copy of letter written to the Federal Land Bank of Baltimore.

"On account of the fact that there was some little argument in regard to the affidavit of Robert Hayton due to the failure of the Bank to notice that on the face of the affidavit it was marked 'copy' and consequently the signature of Robert Hayton to the affidavit was not the same signature as shown on the photostatic copy of the mortgage note which you produced for comparison. I am not making any statement to the Bank in reference to this and would appreciate you calling the Bank's attention to the fact that this affidavit was marked 'copy' on its face and did not purport to have the genuine signature of Robert Hayton.

"I do not think there is any likelihood of you and I having any misunderstanding as you showed a grasp of the situation when you came here and I would rather for you to report this to the Bank than to make any remarks that may be misunderstood by the Bank.

"It was certainly a pleasure for me to be able to talk to you while you were here and I trust that there will be some opportunity in the future to renew our friendship."

Held replied to this letter on January 15, 1937, as follows:

"I desire to acknowledge receipt of your letter of January 13th, accompanying copy of a letter of even date addressed to The Federal Land Bank of Baltimore.

"May I express to you my appreciation for your very kind remarks in connection with my visit to the Smyth County National Farm Loan Association and the result of my contact with its officers and stockholders.

"You may be assure that I will accurately report the discussion regarding the Robert Hayton affidavit and take my full share of the blame for the necessity of any discussion in connection with this matter. I believe you will agree that it was a matter of about 50-50, as I had no way of learning that the signature had been copied by someone other than the party making the affidavit, as it is customary, in cases of this kind, to sign '/s/.' Had this been taken care of, there would have been no difficulty.

"However, I believe the matter has been satisfactorily explained on both sides. Certainly I am satisfied and I am confident the Bank will be."

Birchfield, in answer to Held's letter, said:

"I appreciate your letter of January 15, 1937, as I was genuinely interested in having the Bank know that the affidavits were genuine in every respect. As you say the copy should have shown '/s/', however, when filed in Court the Judge says that the sign defaces the paper and it is not a true copy. Whatever was said about the matter always depends upon the circumstances and in this case nothing will be thought of it.

"The directors of the association and the borrowers were very much impressed with your attitude towards them while here and I have heard many favorable comments. I trust in the future that you will be able to contact them again. I have even heard a borrower from Washington County state that he was looking forward to the Annual Meeting in Washington County hoping that the Bank would send you there."

Plaintiff contends that that part of his testimony quoted, and his letters, are proper matters for the jury to have considered in mitigation of damages, but not in bar of the action.

While plaintiff has a right to maintain this action, or rather to institute it, against the master without joining the servant, a release of the servant, from responsibility for the tort actually committed by him, releases the master. *McLaughlin* v. *Siegel,* 166 Va. 374, 185 S. E. 873. Defendant corporation can only act through and by its agents. It, as a corporation, is liable, if at all, on the theory of *respondeat superior.* If the agent who committed the tort would not have been personally liable for the words he uttered as an agent of the corporation, then the corporatin for whom the agent at the time was acting is not liable.

Plaintiff, by his own evidence, including his testimony and letters, has conclusively, as to himself, established the fact that the words upon which he bases this action were not spoken with malice. Ordinarily, the weight to be given the testimony of any witness is for the jury. "This is not true, however, as to the testimony which he (a litigant) gives himself. No litigant can successfully ask a court or jury to believe that he has not told the truth. His statements of fact and the necessary inferences therefrom are binding upon him. He cannot be heard to ask that his case be made stronger than he makes it, where, as here, it depends upon facts within his own knowledge and as to which he has testified." *Massie* v. *Firmstone,* 134 Va. 450, 462, 114 S. E. 652, 656.

If Held, in performing a duty for defendant and acting as its agent, used the alleged defamatory words without malice, then defendant, who is only chargeable for the acts of the agent, can not be held liable for the malicious use of the same words. A stream can rise no higher than its source.

"In some jurisdictions it is not permissible to join, in the same action, the master who is liable, on the theory of *respondeat superior,* with the servant who committed the tortious act. Cases so holding are cited in a footnote, 18 R. C. L. 780; R. C. L. Per. Sup., vol. 6, p. 4553; 39 C. J. 1314; Burks' Pleading and Practice (3d Ed.) p. 123.

" 'These courts say that while the master is answerable for the acts or omissions of his servant on the ground of *respondeat superior,* the negligence of the servant is neither in fact nor in legal intendment the joint act of the master and the servant. A more liberal view, however, is taken by a majority of the courts, employer and employee being deemed to be jointly liable and jointly suable for the employee's wrongful act. "The servant is liable because of his own misfeasance or wrongful act, in breach of his duty so to use that which he controlled as not to injure another. The master is liable because he acts by his servant, and is, therefore, bound to see that no one suffers legal injury through the servant's wrongful act done in the master's service within the scope of the agency. Both are liable jointly, because from the relation of the master and servant they are united or identified in the same tortious act resulting in the same injury." ' 18 R. C. L. 780." *McLaughlin* v. *Siegel, supra.*

In *New Orleans & N. E. Railroad Co.* v. *Jopes,* 142 U. S. 18, 24, 12 S. Ct. 109, 111, 35 L. Ed. 919, the facts were that plaintiff, while a passenger on the railroad, was shot and wounded by the conductor. In an action to recover for the personal injuries thus sustained, the railway company proved that its servant, the conductor, was justified in his action, and contended that if he was free from liability, the master, the railway company, was likewise free. On this point Mr. Justice Brewer, speaking for the Supreme Court of the United States, said: "It would seem on general principles that if the party who actually causes the injury is free from all civil and criminal liability therefor, his employer must also be entitled to a like immunity," and that this rule applied notwithstanding the high degree of care that a common carrier owed to its passengers.

This conclusion is not changed or weakened by the fact that Held, subsequent to January 12, 1937, in a confidential report to the bank, stated that he did not think that the plaintiff possessed the proper qualifications to act as the secretary-treasurer of the Smyth County National

Farm Loan Association under the "new allowance plan." It was Held's duty to express his honest opinion to his superior on the qualifications of a prospective employee whose employment was subject to the approval of his superior. For the expression of such an opinion to his principal, an agent's non-liability can not be converted into a liability.

For the reasons stated, the judgment of the trial court will be reversed, the judgment set aside, and final judgment entered for defendant.

*Reversed and final judgment.*

CAMPBELL, C. J., and BROWNING, J., dissenting.