## CIRCUIT COURT OF THE CITY OF RICHMOND

Craig Smith

 v.

Interactive Financial
Marketing Group, L.L.C.,
Landmark ATC Holdings, Inc.,
d/b/a Dominion Enterprises,
Robert Harwood,
and Travis B. Weisleder

July 21, 2009

Case No. CL08-5950

BY JUDGE RICHARD D. TAYLOR, JR.

  This matter came on for hearing on April 10, 2009, upon Defendants Dominion Enterprises ("Dominion"), Travis B. Weisleder, and Interactive Financial Marketing Group, L.L.C. ("IFMG"), and Robert Harwood's Demurrers to Plaintiff Craig Smith's Complaint. Plaintiff Smith's Complaint alleges defamation and wrongful discharge. The Defendants state that the Complaint fails to state a cause of action against them for defamation because the Plaintiff does not set forth the exact defamatory and false words forming the basis of Plaintiff's claim. (Dominion's Dem. ¶ 1; Harwood's Dem. ¶ 1; Weisleder/IFMG's Dem. ¶ 2.) Farther, Defendants argue that the Complaint fails to state a cause of action for wrongful discharge because Virginia law

does not recognize a cause of action for wrongful discharge based on the statutes relied upon by Plaintiff. (Dominion's Dem. ¶ 3; Harwood's Dem. ¶ 4; Weisleder/IFMG's Dem. ¶ 4.) William M. Furr and Brett A. Spain of Willcox and Savage represent the Defendant Dominion Enterprises; John A. Gibney of Thompson McMullan represents Defendants Interactive Financial Marketing Group and Travis B. Weisleder; Harris D. Butler, III, of Butler, Williams & Skilling represents the Plaintiff Craig Smith.

For the following reasons, the Court sustains the Demurrers to Count One on the first allegedly defamatory statement and overrules the Demurrers on allegedly defamatory statements two through five. The Court also sustains the Demurrers as to any new words or statements not included in the Complaint, as Plaintiff cannot now raise alleged defamatory statements not pleaded in the Complaint. The Plaintiff is granted leave to file a bill of particulars *in haec verba* regarding the same. The Court sustains the Demurrers on Count Two, the wrongful termination count.

I. The purpose of a demurrer is to determine whether a Complaint states a cause of action upon which the requested relief may be granted. *Welding, Inc. v. Bland County Service Auth.*, 261 Va. 218, 226, 541 S.E.2d 909, 913 (2001). "A demurrer admits the truth of all properly pleaded material facts. 'All reasonable factual inferences fairly and justly drawn from the facts alleged must be considered in aid of the pleading'." *Ward's Equipment, Inc. v. New Holland N. America, Inc.*, 254 Va. 379, 382, 493 S.E.2d 516, 518 (1997).

Craig Smith filed this case on December 30, 2008, seeking damages related to defamation surrounding, and leading to, the Defendants' wrongful termination of his employment from LFMG and Dominion.

The Complaint alleges the following facts. Prior to his termination, Plaintiff served as IFMG's Director of National Accounts under an employment agreement with Dominion and IFMG. (Compl. ¶ 1.)

On or about June 5, 2007, Dominion acquired IFMG and IFMG continued its operations as a division of Dominion. Weisleder remained as General Manager of IFMG and received additional compensation based on IFMG's annual revenue. (Compl. ¶ 10.) Dominion/IFMG targets potential automobile purchasers with less than perfect credit scores, designated as "special finance" or "sub-prime" finance consumers, and passes their consumer credit information to its franchise dealer partners. (Compl. ¶ 11.) Dominion/IFMG generates consumer credit leads through its ownership and licensing of Internet domain names, websites, and toll free numbers where consumers can apply for credit to purchase an automobile. Dominion/IFMG solicits consumer credit applications, screens credit scores and other data

through credit screening mechanisms, and provides consumer credit finance leads ("leads") to automobile dealerships contacted by Dominion/IFMG. (Compl. ¶ 11.) Dominion/IFMG assures prospective consumers it will comply with state and federal regulations related to the use and distribution of personal financial information to other parties. (Compl. ¶ 12.)

Dominion/IFMG must provide "*bona fide* leads," which are leads where the personal and financial information has been screened to meet certain criteria set forth in the agreements with its dealer partners. (Compl. ¶ 14.) In order to assure that the leads it provides to its automotive franchise dealer partners meet the criteria for which the dealer contracted, Dominion/IFMG filters consumer sub-prime credit leads through a computerized filtering system. (Compl. ¶ 14.) Dominion/IFMG's dealer partners agree to pay for a limited number of leads each month, referred to as the franchise dealer's "lead cap." (Compl. ¶ 16.) Dominion/IFMG's automotive franchise dealers pay a fee to Dominion/IFMG for each lead provided to the dealer. (Compl. ¶ 17.) The computerized systems are programmed to maximize the number of leads sent to each automotive franchise dealer partner each month in order to maximize the amount of fees Dominion/IFMG can charge each dealer partner. (Compl. ¶ 18.)

On or about August 20, 2007, Dominion/IFMG and Plaintiff entered into an employment agreement under which Plaintiff served as Dominion/IFMG's Director of National Accounts. (Compl. ¶ 20.) As Director of National Accounts, the Plaintiff was Dominion/IFMG's liaison with many of its largest accounts. (Compl. ¶ 21.) During the fall of 2007, Plaintiff had discussions with Weisleder and other management regarding increasing sales revenues, but Defendants did not indicate Plaintiff was not performing as required or that his job was in jeopardy. (Compl. ¶ 22.) Weisleder told Plaintiff that his plans to increase revenue and job efforts were consistent with Defendants' expectations and that Plaintiff was doing a "good job." (Compl. ¶ 22.)

During December 2007, car sales and consumer loan applications were low throughout the country. As a result, the number of authorized leads Dominion/IFMG could provide in accordance with its representations to customer credit applications and automotive franchise dealer partners as "*bona fide* leads" was also extremely low and fell below Dominion/IFMG's projections. (Compl. ¶ 23.) By mid-December 2007, most of Dominion/IFMG's franchise dealer partners were not on pace to meet their "lead cap" for the month. (Compl. ¶ 24.) It is alleged that, on or about December 27, 2007, Weisleder, either directly or through persons under his control and supervision, instructed Dominion/IFMG personnel to turn "off"

the filtering mechanism, which caused an increase in the number of customer credit applicant leads sent to the automotive franchise dealer partners. (Compl. ¶ 25.) The Defendants' alleged misuse of consumer credit financial information resulted in increased Dominion/IFMG revenue and in Weisleder's and/or Dominion/IFMG's financial gain. (Compl. ¶ 25.) It is further alleged that Harwood stood to gain financially due to side agreements Weisleder had offered senior managers if they assisted him in attaining revenue goals. (Compl. ¶ 26.)

Plaintiff argues that the increase in unfiltered sub-prime credit "leads" resulted in a breach of Dominion/IFMG's obligations to its automotive franchise dealer partners, who did not receive what IFMG and Dominion contracted to provide. (Compl. ¶ 27.) From December 26 through January 2, the filters for individual dealer partners who questioned the lack of "lead" quality were reactivated, and, on January 2, 2008, the filter was turned back on for all dealer partners. (Compl. ¶ 29.) As a result of the filtering system being deactivated, Dominion/IFMG forwarded unfiltered consumer credit applications, representing them as meeting criteria they did not meet. (Compl. ¶ 30.) As a result of the filtering system being turned off on December 26, 2007, several Dominion/IFMG automotive franchise dealer partners reduced their monthly "lead caps" and/or terminated their contracts with Dominion/IFMG. (Compl. ¶ 31.)

Dominion had policies encouraging the report of unethical conduct, including "open-door" policies and an "HR Hotline." (Compl. ¶ 32.) It is alleged that, by December 31, 2007, Plaintiff learned that the filter deactivation had been ordered or authorized by Weisleder and carried out by other senior management at Weisleder's direction through senior management's instruction to the Dominion/IFMG system administrators. (Compl. ¶ 33.) On or about January 5, 2008, after discovering that Dominion/IFMG had turned off the computerized filter system, Plaintiff reported through his management, including Weisleder, that he had become aware that the filter had been deactivated and requested that Weisleder permit him to transfer from IFMG to another Dominion company. (Compl. ¶ 33.) Plaintiff alleges that this was not the first time the filters had been deactivated, as Dominion/IFMG, Weisleder, and/or Harwood had deactivated the filters in the spring of 2007. (Compl. ¶ 34.)

Plaintiff further alleges that, following his questioning of the filter deactivation and request to transfer, Weisleder attempted to prohibit Plaintiff from further reporting Weisleder's conduct and engaged in a campaign to undermine Plaintiff's credibility within, and outside, Dominion/IFMG. (Compl. ¶ 35.) Weisleder, Harwood, and Dominion/IFMQ began to falsely

characterize facts by suggesting Plaintiff's performance was lacking. (Compl. ¶ 36.) Defendants falsely represented prior efforts Plaintiff had made to increase revenues, excluded Plaintiff from meetings, and canceled scheduled business trips. Weisleder and other managers instituted new, unrealistic, and unwritten "performance goals" for Plaintiff designed to make it appear as though Plaintiff failed to meet performance expectations. (Compl. ¶ 36.) These new goals were implemented to further the defamatory message that Plaintiff had caused the bad leads resulting from the filter deactivation and was otherwise incompetent in the performance of his duties. (Compl. ¶ 36.)

Weisleder and Harwood instructed IFMG personnel to blame Plaintiff for the increased number of unfiltered leads when discussing the incident with customers. (Compl. ¶ 37.) Weisleder initiated the termination of Plaintiff's IFMG and Dominion employment, effective February 4, 2008. (Compl. ¶ 38.) Plaintiff repeatedly attempted to bring the matter to the attention of senior Dominion management; however, Dominion/IFMG ratified Weisleder's and Harwood's actions in order to conceal the action from various reporting requirements to customer applicants, regulatory bodies, the financial services media, and/or internal and external audit functions. (Compl. ¶ 39.)

Plaintiff asserts he has suffered emotional damages, been damaged in his reputation, and suffered a loss of wages and wage related benefits as a result of Defendants' willful actions. (Compl. ¶ 41.) Plaintiff also seeks punitive damages from Defendants. (Compl. ¶ 42.)

II. In his Complaint, the Plaintiff alleges Defendants made the following defamatory statements: (1) "if the dealers ask about the bad leads, blame it on Craig; say that lots of things he was asked to do did not get done"; (2) "blame [the bad "leads" resulting from the filter deactivation] on Craig"; (3) Smith had not contacted 15% of his accounts; (4) Smith had not added any new accounts or increased the revenue volume to existing accounts; and (5) Smith had failed to meet express job expectations. (Compl. ¶¶ 45, 46.)

The Court agrees with Defendants that the first allegedly defamatory statement, "if the dealers ask about the bad leads, blame it on Craig; say that lots of things he was asked to do did not get done," is a command, and not a statement. "Speech that does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person, are not actionable." *Yeagle v. Collegiate Times*, 255 Va. 293, 295, 497 S.E.2d 136, 137 (1998). Statements that "are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion." *Jordan v. Kollman*, 269 Va. 569, 576, 612 S.E.2d 203, 206 (2005). "Although a defamatory statement may be inferred, a court may not 'extend the meaning

of the words used beyond their ordinary and common acceptance'." *Tronfeld v. Nationwide Mutual Ins. Co.*, 272 Va. 709, 714, 636 S.E.2d 447, 450 (2006), citing *Perk v. Vector Resources Group*, 253 Va. 310, 316, 485 S.E.2d 140, 144 (1997). The Court finds the first allegedly defamatory statement does not provide either a "false factual connotation" or state "actual facts about" the Plaintiff, and thus, is not actionable. The Court sustains the demurrer as to the first allegedly defamatory statement.

The Court finds the other four allegedly defamatory statements have been properly pleaded by the Plaintiff in the Complaint. "Good pleading requires that the exact words spoken or written must be set out in the declaration *in haec verba*. Indeed, the pleading must go further, that is, it must purport to give the exact words." *Federal Land Bank of Baltimore v. Birchfield*, 173 Va. 200, 215, 3 S.E.2d 405, 410 (1939). "Not only must the exact words be charged, but they must be proven, or at least a sufficient number proven to make out a good cause of action. Words equivalent or of similar import are not sufficient." *Id.*

Although the Supreme Court of Virginia asserted in *Federal Land Bank* that the exact words alleged must be pleaded, in *Carwile v. Richmond Newspapers*, 196 Va. 1, 7, 82 S.E.2d 588, 591-92 (1954), the Court also stated "[i]n order to render words defamatory and actionable, it is not necessary that the defamatory charge be in direct terms but it may be made indirectly, and it matters not how artful or disguised the modes in which the meaning is concealed if it is in fact defamatory." A defamatory charge can be made by inference, implication, or insinuation. *Hyland v. Raytheon Tech. Servs.*, 277 Va. 40, 47, 670 S.E.2d 746, 750 (2009) (*Raytheon II*).

In determining whether a statement is one of fact or opinion, a court may not isolate one portion of the statement at issue from another portion of the statement, rather, a court must consider the statement as a whole. *Raytheon Tech. Servs. v. Hyland*, 273 Va. 292, 303, 641 S.E.2d 84, 91 (2007) (*Raytheon I*). "The requirement that an allegedly defamatory statement he considered as a whole also is vital to a determination of the truth or falsity of a defamation claim, because defamatory statements may be made by implication, inference, or insinuation." *Raytheon II*, 277 Va. at 47, 670 S.E.2d at 751. The factual portions of an allegedly defamatory statement "may not be evaluated for truth or falsity in isolation, but must be considered in view of any accompanying opinion and other stated facts." *Id.* at 48, 670 S.E.2d at 751.

Considering the other four allegedly defamatory statements as a whole and viewing the stated facts and context in which the statements were made, the Court finds the statements were pleaded with the requisite specificity. The

Court overrules the Demurrers as to alleged defamatory statements two through five. The Court sustains the Demurrers as to any new words or statements not included in the Complaint, as Plaintiff cannot now raise alleged defamatory statements not pleaded in the Complaint. The Plaintiff is granted leave to file a bill of particulars *in haec verba*.

III. The Court agrees with the Defendants that the Complaint does not state a cause of action for wrongful discharge under Virginia Law. Virginia strongly adheres to the common law employment-at-will doctrine, and an employment relationship is presumed to be at-will, meaning the employment term extends for an indefinite period and may be terminated by employer or employee for any reason upon reasonable notice. *County of Giles v. Wines*, 262 Va. 68, 72, 546 S.E.2d 721, 723 (2001). The presumption that an at-will relationship exists may be rebutted if sufficient evidence is produced to show the employment is for a definite, rather than an indefinite, term. *Id.*

In *Bowman v. State Bank of Keysville*, the Supreme Court of Virginia recognized an exception to the doctrine of employment-at-will based on an employer's violation of public policy in the discharge of an employee. 229 Va. 534, 331 S.E.2d 797 (1985). The Supreme Court in *Rowan v. Tractor Supply Co.*, however, asserted that this is a narrow exception. 263 Va. 209, 559 S.E.2d 709 (2002). "While virtually every statute expresses a public policy of some sort, we continue to consider this exception to be a 'narrow' exception and to hold that 'termination of an employee in violation of the policy underlying any one [statute] does not automatically give rise to a common law cause of action for wrongful discharge'." *Id.* at 213. 559 S.E.2d at 711. In only three circumstances has the Supreme Court concluded the claims were sufficient to constitute a common law action for wrongful discharge under the public policy exception: (1) an employer violates a policy enabling the exercise of an employee's statutorily created right; (2) public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy; and (3) discharge based on the employee's refusal to engage in a criminal act. *Id.* at 213-14, 559 S.E.2d at 711.

The Supreme Court of Virginia further restricted the *Bowman* exception in *City of Virginia Beach v. Harris*, 259 Va. 220, 523 S.E.2d 239 (2000), and *Mitchem v. Counts*, 259 Va. 179, 523 S.E.2d 246 (2000), by clarifying that only the violation of two types of statutes may give rise to a viable wrongful discharge claim: (1) a statute explicitly stating it expresses a public policy of the Commonwealth or (2) a statute that implicitly expresses an established state public policy which is designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general that the discharge

violates. The Court further narrowed *Bowman* in *Harris* and *Mitchem* by stating that, even if a statute falls into one of these two categories, "an employee must be a member of the class of persons that the specific public policy was designed to protect." *Mitchem*, 259 Va. at 189, 523 S.E.2d at 252-53; *Harris*, 259 Va. at 233, 523 S.E.2d at 245.

The type of wrongful discharge claim presented in this case is a "Type 2 *Bowman* claim." Plaintiff cannot establish a Type 1 *Bowman* claim because he has not alleged that the Defendants interfered with any statutorily created right. Plaintiff cannot establish a Type 3 *Bowman* claim because he has not alleged that his discharge was based on his refusal to commit a criminal act. Plaintiff alleges the Defendants have violated several statutes providing a public policy exception pursuant to *Bowman* and that the Plaintiff is a member of the class of persons directly entitled to the protection enunciated by the public policy. Plaintiff relies on the following Credit Protection and Consumer Protection statutes: the Virginia Credit Services Act, Va. Code §§ 59.1-335.2, *et seq.*, the Virginia Computer Information Transactions Act, Va. Code §§ 59.1-501.1, *et seq.*, and the Virginia Consumer Protection Act, Va. Code §§ 59.1-196, *et seq.* Plaintiff argues the policies underlying these statutes are designed to protect the property rights, personal freedoms, health, safety, or welfare of the people of the Commonwealth.

Whether these statutes provide public policy protections or not, they are applicable to consumers and not to employees, such as the Plaintiff. Regarding the Virginia Consumer Protection Act ("VCPA"), the Court holds this statute protects consumers of goods and services, and regulates suppliers of consumer goods and services. The Plaintiff as an employee, and not a consumer, is not entitled to protection under the VCPA. The United States District Court for the Western District of Virginia asserted that the legislative intent of the VCPA is "to promote fair and ethical standards of dealings between suppliers and the consuming public," and found it did not implicate any public policy interests that would trigger a *Bowman* claim. *Lucker v. Cole Vision Corp.*, No. 7:05CV00126, 2005 U.S. Dist. LEXIS 25118, at *19-20 (W.D. Va. 2005). The United States District Court for the Eastern District of Virginia analyzed the VCPA against the rubric set forth in *Miller v. Sevamp, Inc.*, 234 Va. 462 (1987), and found that the statute generally protected the public at large, but did not expressly or implicitly enunciate any public policy adequate to a *Bowman* claim because it did not protect any category of interests defined as policy predicates in *Bowman* and *Sevamp*. *Leverton v. AlliedSignal, Inc.*, 991 F. Supp. 486, 492-93 (E.D. Va. 1998). In *Lucker*, the United States District Court for the Western District of Virginia found that, while the VCPA generally protects the public at large from unfair and unethical transactions by

suppliers, this did not overcome the strict policy prerequisite to trigger the exception to the employment-at-will doctrine. *Lucker*, 2005 U.S. Dist. LEXIS 25118, at *22-24. The Court asserted that, even if it construed the VCPA as implicating a public policy triggering the exception, Lucker was not within the protective reach of the statute because he was an employee and not a consumer. *Id.* at *24.

The Virginia Credit Services Business Act ("VCSBA") is also a statute enacted to protect consumers and thus inapplicable to an employee of a credit services company. The VCSBA protects consumers from improper practices related to businesses involved in credit services, not employees of these companies. The VCSBA indicates it may be liable to consumers; however, it does not provide any such liability for employees. Va. Code § 59.1-335.10.

In addition, the Uniform Computer Information Transactions Act ("UCITA") is not applicable to the Plaintiff in this case. The UCITA is designed to protect individuals involved in computer information transactions, such as agreements to create, transfer, modify, or lease computer information. Section 59.1-501.3(d)(5) provides that this statute does not apply to "a contract of employment of an individual, other than an individual hired as an independent contractor, unless such independent contractor is a freelancer in the news reporting industry as that term is commonly understood in that industry." Va. Code § 59.1-501.3(d)(5). The Court finds this statute is not applicable to Plaintiff, and Plaintiff cannot bring a wrongful discharge action pursuant to it.

Plaintiff's reliance on *Harless v. First National Bank in Fairmont*, 162 W. Va. 116, 246 S.E.2d 270 (1978), is misplaced, as *Harless* is unpersuasive authority and inapplicable in this case. In *Harless*, the Supreme Court of Appeals for West Virginia held the Legislature intended to establish a clear and unequivocal public policy that consumers of credit covered by the West Virginia Consumer Credit and Protection Act were to be given protection. *Id.* at 125-26. The Court asserted, "[s]uch manifest public policy should not be frustrated by a holding that an employee of a lending institution covered by the Act, who seeks to ensure that compliance is being made with the Act, can be discharged without being furnished a cause of action for such discharge." *Id.* at 126. *Harless* involves a West Virginia statute inapplicable in Virginia. Therefore, the analysis of the Supreme Court of Appeals for West Virginia is unpersuasive in this Court.

The Court sustains the Demurrers as to Count Two, the wrongful discharge claim, finding Plaintiff is not entitled to bring this action under Virginia law pursuant to the statutes relied upon.

IV. In sum, the Court sustains the Demurrers as to Count One on the first allegedly defamatory statement and overrules the Demurrers on allegedly defamatory statements two through five. The Court also sustains the Demurrers as to any new words or statements not included in the Complaint, as Plaintiff cannot now raise alleged defamatory statements not pleaded in the Complaint. The Plaintiff is granted leave to file a bill of particulars *in haec verba* within thirty days. The Court sustains the Demurrers on Count Two, the wrongful termination count. It is so ordered.