MRS. THERESA MONTELEONE

*v.*

CO-OPERATIVE TRANSIT COMPANY

(No. 9670)

Submitted September 25, 1945. Decided December 11, 1945.

*Gordon D. Kinder* and *Jay T. McCamic*, for plaintiff in error.

*Handlan, Garden, Matthews & Hess*, for defendant in error.

KENNA, JUDGE:

This writ of error was granted to a judgment for $5,000 in favor of Theresa Monteleone against Co-Operative Transit Company by the Circuit Court of Ohio County in an action of trespass on the case brought to recover damages for a personal injury allegedly suffered by the plaintiff on the evening of September 23, 1942. As we view the assignments of error the controlling question is of first impression in this jurisdiction and is whether there can be a recovery for post traumatic psychoneurosis caused by nervous shock not caused by impact due to the failure of the defendant to exercise required care. Before that question is reached, however, it will be necessary to discuss the application of the doctrine of *res ipsa loquitur* to the practically uncontroverted questions of fact disclosed by this record, the defendant contending that it has met the duty imposed by that doctrine, and the court having given plaintiff's Instruction No. 1 based thereon.

The defendant operates an electric street car line in and around the City of Wheeling. At the time of the accident the plaintiff, her husband and six sons and daughters lived in Warwood, a section of Wheeling on the Ohio River to the north. On the evening in question she, her daughter Josephine and her son Frank, aged seventeen, together with a neighbor, Mrs. Di Stefano, and her child, had gotten into Frank's 1928 Studebaker sedan and started south on Warwood Avenue on their way to a moving picture theatre. Frank was driving, Mrs. Monteleone sitting at his right with her daughter Josephine immediately behind her on the back seat, with Mrs. Di Stefano on the left rear seat just beyond her thirteen year old daughter Marie. They were driving at a speed estimated at twenty-five miles an hour. As they passed what seems to be a bend in Warwood Avenue at Seventh Street they noticed several hundred feet ahead of them what they described as a flash about the height of the trolley wire.

At this point the street car line on Warwood Avenue is double tracked in the middle of the street with overhead trolley wire above each track. Cars were parked on the right or west so that in following the south bound traffic lane Frank's Car "straddled" the west or right rail of the double track.

As they were passing Seventh Street Frank noticed a street car in the neighborhood of one hundred yards ahead of them while near Fifth Street, also going south. Immediately below Fourth Street a man wearing a white shirt came from between two parked cars on the right and attempted to flag them by waiving his arms. Frank thought that he was undertaking to "thumb a ride" and, having a full car, he swerved to the left in order to pass and having done so he pulled back into his former position. Immediately thereafter the Monteleone car struck a trolley wire that had fallen due to a break at the cross support connection immediately ahead. The wire struck the car between the right headlight and the right front fender and its occupants testify that they immediately

saw vivid flashes or flames. Frank threw on his foot-brake and opened the door to his left. Apparently this threw his mother forward but not with enough violence to injure her. Noticing that the car had not freed the wire Frank released the brake, closed the door and decided to pass the end of the wire before stopping. Apparently the end of the wire caught momentarily on the cross support of the headlight so that the pull at the wire's connection with the cross support immediately back of the car caused it to break almost simultaneously with the freeing of the end of the wire from the headlight. At any rate, as the car went forward the end of the wire was released from what had caught it, so that it struck and shattered the car's right front windshield, it being of plain glass. Mrs. Monteleone says that she was covered with glass splinters and that her face was slightly cut, the cut being about the size of a pimple. Frank pulled to the right, stopped at the curb and the occupants of the car got out and brushed off the splintered and powdered glass. The entire occurrence had taken but a few seconds.

The street car had stopped just below the point where Frank had pulled to the curb, and the motorman had taken a wooden implement made for the purpose and was fastening the live wire to a post at a height that would not endanger pedestrians nor motorists. He asked Frank whether anybody in his car had been injured and Frank told him no but that his car had been slightly damaged. Frank then went back to the automobile in which his mother and the others were then seated, they went to the moving picture show and returned home between ten and eleven o'clock.

On behalf of the defendant it was shown that the trolley wire had been inspected in June by an experienced workman traveling on a scaffold car constructed for that purpose and had been found in satisfactorily safe condition including the "splicer" where the break had occurred. On behalf of the plaintiff it was shown by two witnesses that the trolley wire had broken and

come to the ground at about the same place in the previous spring. The Company introduced by its inspector in charge its record of such matters and sought to prove thereby that no such break had occurred, the inspector stating positively that if so his records would certainly show it.

The Company's showing of care went into considerable detail and it contends now that it met the rule laid down by the maxim of *res ipsa loquitur* (the thing itself speaks). The Company also contends that in Instruction No. 3 given for the plaintiff the court erroneously told the jury that the defendant was charged with the highest degree of care.

There is a great deal of confusion in the decided cases touching the doctrine of *res ipsa loquitur* and there are two very well defined viewpoints. One is that the doctrine shifts the burden of proof and is not a rule of evidence but of substantive law; the other that it affects only the question of going forward with the evidence, and that if the defendant makes available to the court all of the information in its control touching the source of injury and places upon the stand the persons acting for it in charge of the instrumentality that caused the injury, then, if with its own evidence added, the plaintiff has been unable to prove a breach of duty his case fails. There is no doubt but that West Virginia has long been committed to the latter application of the doctrine. However, here we are of the opinion that the defendant's proof fell far short of establishing the exercise of proper care of an instrumentality with the known danger of electricity. The parting of the wire below Fifth Street was at the exact point that the wire had parted before and been mended. The trolley pole on the street car ahead of the automobile in which plaintiff was riding had thrown the trolley wire, and probably caught the next cross support, pulled it in the direction the car was moving, so that when released by the pole passing under, the "back lash" thereby caused resulted in the trolley wire breaking at a "splicer" where it had already been

mended, the splicer being a metal sleeve or tube large enough to almost encircle the trolley wire at each end of the sleeve and hold it firmly, evidently being provided with teeth that hold the trolley wire by being imbedded in the soft copper. Naturally the trolley wire became weakened to the extent that the teeth were imbedded, although that extent is not shown. The greatest number of wire drops occurred at these splicers. It is testified by two witnesses for plaintiff that the trolley wire had broken at approximately the same location in the previous spring, although the records of the company that its witnesses stated would have an entry for necessary repair work, did not so show. The defendant's overhead line maintenance superintendent at the time of the accident testified that when the trolley wire became worn to fifty per cent of its original size it was regarded as unsafe while one of its linemen who had examined the line in question shortly before September, 1943, stated that, "It wasn't quite hardly one-half worn down". We are doubtful under this state of the evidence that the trial court would have been justified in holding that as a matter of law the defendant had failed to meet the doctrine of *res ipsa loquitur,* and yet we are quite convinced that it would not have been justified in instructing the jury that defendant, as a matter of law, had shown proper care. We believe that the trial judge correctly submitted the question of negligence to the jury.

The principal question presented by the assignments of error is whether the plaintiff has been able to establish damages which were the proximate result of the accident caused by the defendant's lack of proper care. Undoubtedly all of the verdict of $5,000, with the possible exception of a negligible amount that may have been based upon what the plaintiff spoke of as a cut on her cheek about the size of a pimple caused by shattered glass from the windshield, was intended as compensation for a mental and emotional disturbance that she says she suffered due to the accident.

Mrs. Monteleone testified that beginning ten days or two weeks after the accident she suffered frequent attacks of violent headaches causing pain that felt like spikes had been driven into her skull and that she often thought the telephone rang or children called her when there was no happening of the sort. Members of her family state that she so impressed them. She underwent several medical examinations and the testimony of her physicians is that her symptoms were subjective entirely, and that they did not discover surgical or physical trouble of any sort.

Dr. Wanner, the psychiatrist who testified on behalf of the plaintiff, first saw her ten and one-half months after the accident. He said that in his opinion plaintiff had suffered a post-traumatic psychoneurosis. Asked whether that condition had been caused by the accident, he stated that the plaintiff is a high-strung, emotional woman whose medical history over the past ten or twelve years had been quite serious and that she had been subjected to one major and one minor operation. With that disposition and history Dr. Wanner stated that he believed that the accident had precipitated the causes of her condition at the time of trial, and that the fact that since the accident two of her sons had gone into the armed service of the United States was probably a contributing factor. Dr. Wanner did not consider the slight cut that plaintiff below had suffered in reaching his conclusion. Dr. Wingerter, a psychiatrist employed by the defendant to observe the plaintiff during the trial, testified that in his opinion based upon a lack of physical nervousness and the presence of mental composure and alertness exhibited by the plaintiff while under his observation, she was not psychoneurotic. With that conflict, the verdict for the purposes of this review resolve that question in favor of the plaintiff.

From the conflict of authority created by the decided cases in this country dealing with mental and emotional disturbances caused by the wrong of another, there appear to be but three fairly well settled principles allow-

ing recovery: First, those mental disturbances that accompany or follow an actual physical injury caused by impact upon the occurrence of the tort; second, where there is no impact and no physical injury at the time, but a physical injury afterwards results as the causal effect of a nervous shock which in turn was the proximate result of the defendant's wrong; and third, where there was no impact and no physical injury caused by the defendant's wrong, but an emotional or mental disturbance is shown to have been the result of the defendant's intentional or wanton wrongful act. In any of the foregoing classifications we believe that the plain weight of authority sustains a recovery. There are also a few cases sustaining recovery for mental and emotional injury alone caused by the defendant's simple negligence. We believe it would serve no useful purpose at this time to discuss in detail the rather embryonic theories of the decided cases other than to comment upon the fact that their major principles, conflicting as they now are, illustrate a phase of the perpetual evolution of the common law in its effort to keep abreast of development and progress. The following citations used as reference material we believe to be sufficient: 52 Am. Jur. 388, et seq; 23 A.L.R. 361; 44 A.L.R. 428; 56 A.L.R. 657; 98 A.L.R. 402; and other annotations referred to there.

Plaintiff below does not contend that she suffered a physical injury resulting after the accident from a nervous shock received at that time. Neither does she contend that the defendant's alleged negligence was wanton. The weight of the testimony is plainly to the contrary on both positions. She does contend that her case falls within the first category, that is, that she is suffering from a nervous and emotional shock received contemporaneously with a physical impact caused by the defendant's wrongful act and that the testimony shows that the shattered windshield made a cut upon her face about the size of a pimple. No doctor saw the cut.

We realize fully that there are a number of cases which sustain the theory that a wrongful impact, how-

ever slight, is sufficient to sustain a recovery for mental pain and suffering however severe, leaving it to the jury to apply the principle of cause and effect under the facts shown, no matter how attenuated. *Porter* v. *Delaware, L. & W. R. Co.,* 73 N.J.L. 405, 63 Atl. 860; *Kennell* v. *Gershonovitz Bros.,* 84 N.J.L. 577, 87 Atl. 130; Note, 11 A.L.R. 1119, 1128; Note, 40 A.L.R. 983. On the other hand there are a number of what we believe are well considered cases that hold that the bodily suffering and mental pain for which recovery is sought must show a natural connection, or, as some cases say, must be inseparable, and that there can be no recovery for mental suffering that is but remotely connected with a physical injury. *Southern Pacific Company* v. *Hetzer,* 68 C.C.A. 26, 135 Fed. 272, 1 L.R.A. (N.S.) 288 and cases cited under paragraph 177, 15 Am. Jur. 594. The foregoing authorities, although they do not expressly base their holdings upon the principle that the lack of causal connection may so clearly appear that the plainly missing sequence becomes a question of law for the court and is not a question of fact for the jury, nevertheless seem to deal with that idea by clear implication. Otherwise a case based upon negligence where the proof showed the slightest actual bodily contact as a result, would in theory throw wide the door to subjective symptoms of mental hurt alone, even though it could not conceivably have resulted from the impact. To say, as some cases do, that an impact alone, no matter how slight, is sufficient to identify the plaintiff's claim to emotional or mental injury as being actual, as distinguished from imaginary, we think is largely fictional. See *Homans* v. *Boston Elevated Railway,* 180 Mass. 456, 62 N. E. 737, 57 L. R. A. 291, 91 Am. St. Rep. 324. Both impact and mental suffering appear here, but they are shown as segregated elements, remotely connected, if at all. Where there is no substantial physical injury claimed and the relationship between the injury caused by the impact and the mental condition for which damages are sought is not shown, as here, the lack of consequence is a matter of law for the court. Lacking that relationship we do

not believe that mere impact can act as a vehicle for the recovery of damages for nervous shock or emotional injury, it not being contended that the nervous shock of the plaintiff below was a physical injury.

Massachusetts apparently adheres to what may be called the common law rule of some time ago to the effect that a bodily injury no matter how slight does support a recovery for mental injuries no matter how great, but that it is a necessary element. Justice Holmes, speaking for the Court in *Homans* v. *Boston Elevated Railway*, 180 Mass. 456, 62 N. E. 737, 57 L. R. A. 291, 91 Am. St. Rep. 324, referred to that rule as an arbitrary exception that prevents a recovery for visible illness resulting from nervous shock alone. In the *Homans* case the plaintiff had received a slight blow by being thrown against the seat of an automobile. The Court held that the battery justified a recovery for the nervous shock and what followed. The recovery was for $5,000. In *Megathlin* v. *Boston Elevated Railway*, 220 Mass. 558, 108 N. E. 362, Ann. Cas. 1917A, 948, the recovery by a woman who was seated in a stationary car that defendant's car struck causing her car to ram another stationary car just ahead was sustained. Plaintiff said that she was thrown backwards and forwards but did not know whether she struck anything or did not. Recovery was allowed for a nervous shock and mental disturbances which caused an eruption.

In a case involving facts similar to those disclosed by this record, the Connecticut Supreme Court reversed a judgment favoring the defendant in *Orlo* v. *Connecticut Company*, 128 Conn. 231, 21 A. 2d 402, holding that there was no liability upon the town, a co-defendant, but that the trolley company could be required to submit its defense to a jury. The plaintiff was a passenger in an automobile that was following one of the defendant's cars. The trolley wire of the defendant's line broke due to the trolley pole of its car causing that wire to come in contact with other wires, creating intense heat. The broken trolley wire struck the top of the automobile and caused it to collide with the car ahead.

The driver of the automobile as he attempted to get out was thrown to the ground by an electric shock. There were flashes and flares but the plaintiff remained seated in the automobile. "He claimed to have proved that he received shock from the electricity, * * *". That claim was in no way corroborated. He also claimed severe nervous shock. The court instructed the jury that there could be no recovery for fright or shock alone unaccompanied by physical injury; that physical injury means an injury due to the application of force and is not "from perspiration of the body or from heart disturbance or from nervous disturbance", but that even though the contemporaneous physical injury was slight there could be a recovery for mental, nervous or other condition resulting therefrom. The Supreme Court reversed the verdict in favor of the electric company because the court had failed to follow the rule, found by the Supreme Court in an exhaustive discussion to be sustained by a majority of the well reasoned cases, that there can be a recovery in the absence of impact where the nervous shock is followed by physical injury traceable to it. However, the Court, evidently apprehending the danger of over extension, restricted the principle announced to persons "within the range of ordinary physical danger from that negligence". Although the facts in the *Orlo* case more nearly resemble the facts shown by this record than any other case we have been able to find, it is to be distinguished because there there was a physical injury following the shock, while here there is none.

Although in West Virginia the question with all of its intricacies is one of first impression, this Court has by way of *obiter* indicated views upon which we think we should comment. In *Davis* v. *Telegraph Co.*, 46 W. Va. 48, 32 S. E. 1026, the Court quoted with approval the following language from 1 Am. Eng. Enc. Law, 862: "A rule that is more consistent with recognized legal principles, and that is supported by better authority, is that mental suffering alone, and unaccompanied

by other injury, cannot sustain an action for damages, or be considered as an element of damages. *Anxiety of mind and mental torture are too refined and too vague in their nature to be the subject of pecuniary compensation in damages,* except where, as in case of personal injury, they are so inseparably connected with the physical pain that they cannot be distinguished from it, and are therefore considered a part of it;" (Underscoring ours). This case was decided in 1899 and the language quoted was likely from a text published several years before that time. It involved damages resulting from the failure to transmit and deliver a social telegram. In the later case of *Lambert* v. *Brewster*, 97 W. Va. 124, 138, 125 S. E. 244, this Court said this: *"To us the thought that there may be no recovery at all for physical injuries resulting from nervous shock simply because there has been no touching of the person seems strange indeed.* As some one states, it savors of a victory of psychology over physiology. As remarked in *Dulieu* v. *White*, 'remoteness' relates not to time, but to casual sequence. And if the physical harm be traced directly through plaintiff's fright to defendant's wrong, the fact that defendant could not foresee or anticipate the natural result can not excuse him from the consequences." (Underscoring ours.) The claim in the *Lambert* case was damages for a miscarriage due to shock caused by wrongfully and violently assaulting plaintiff's father in her presence. This Court reinstated a verdict for the plaintiff and rendered judgment here.

There is ample authority sustaining recoveries for miscarriages under similar circumstances and, indeed, they are likely the pioneer cases sustaining the theory that a nervous shock without impact followed by harmful physical disturbances may be the basis of a recovery. This Court is committed to that doctrine but we think it clearly inapplicable here. The *Davis* case was decided before the theory that a person has "a legal right to

mental tranquility" had been developed to the extent that it now has.

Being of the opinion that the lack of causal sequence between the slight cut to plaintiff's cheek suffered as a result of the impact and the extremely serious mental disorder without physical injury to which she testified she was subjected, clearly appears, and consequently that the defendant's motion for a directed verdict should have been sustained, the judgment of the Circuit Court of Ohio County is reversed, the verdict set aside and the defendant awarded a new trial.

The other assignments of error become inconsequential, but under the circumstances we think deserve notice.

The plaintiff's instruction, given by the court, that told the jury that the defendant was required to use the highest degree of care we think did not overstate its legal duty. True, it is not an insurer and public service requirements must be considered. The term "highest degree of care" is rather abstract, yet the courts in general have stressed the high degree of duty required in using and transmitting electricity. See *Snyder* v. *Wheeling Electrical Co.*, 43 W. Va. 661, 28 S. E. 733, 39 L.R.A. 499, 64 Am. St. Rep. 922.

The defendant contended that there were several items included in the testimony concerning actual outlay for drugs and other articles purchased by the plaintiff that should not have been permitted to go to the jury. The court did instruct the jury to ignore certain testimony of that kind that had been admitted over the defendant's objection, and since there were no special interrogatories it is not practicable for this Court to undertake to say what items were included and what items were excluded in the amount of the verdict, the declaration not having sought a recovery for special damages.

As to the verdict's excessiveness we are under the impression that on the plaintiff's theory of mental and emotional injury due to the defendant's negligence, if

the jury was impressed, as it must have been else there would have been no verdict, of the genuineness of the plaintiff's difficulty and claim, the sum of $5,000 is well within bounds.

The judgment of the Circuit Court of Ohio County is reversed, the verdict set aside, and a new trial awarded.

*Reversed.*