JOHN C. HARLESS

*v.*

FIRST NATIONAL BANK IN FAIRMONT, *etc., et al.*

(No. CC901)

Decided July 14, 1978.

*David L. Solomon and S. J. Angotti* for plaintiff.

*Herschel Rose, Timothy J. Padden, Rose, Southern & Padden, Herbert G. Underwood, Steptoe & Johnson* for defendants.

MILLER, JUSTICE:

This certified case presents the question of whether there is any occasion in which an employee who is employed at will can recover damages against his employer when he is discharged.

The plaintiff's complaint contained two counts. The first count alleged that his discharge was in retaliation for his efforts to bring to the attention of and require his employer to operate in compliance with the State and Federal consumer credit and protection laws. The second count claimed that the employer's conduct leading up to and surrounding the discharge amounted to intentional, malicious and outrageous conduct which caused the plaintiff severe emotional distress.

The trial court determined that this did not state a cause of action and granted a motion to dismiss on Counts I and II of the complaint and certified its ruling to us under the provisions of W.Va. Code, 58-5-2.[1] We hold

---

[1] W.Va. Code, 58-5-2, reads in part:

"Any question arising upon the sufficiency of a summons or return of service, upon a challenge of the sufficiency of a pleading or the venue of the circuit court, upon the sufficiency of a motion for summary judgment where such motion is denied, or a motion for judgment on the pleadings ... may, in the discretion of the circuit court in which it arises, and shall, on the joint application of the parties to the suit, in beneficial interest, be certified by it to the supreme court of appeals for its decision, ..."

that a cause of action is properly stated and reverse the trial court's ruling.

Plaintiff's allegations must be accepted as true on a motion to dismiss and construed most favorably to him.[2] He states he was employed by the defendant, the First National Bank of Fairmont, beginning in 1967. He had no written contract of employment, but asserts that as a result of his diligence and good service for the bank he was rewarded by periodic salary increases and promotions until he became Office Manager of the Consumer Credit Department in 1971. Plaintiff asserts that in order to better perform his services and with the encouragement of the bank, he continued his education in banking matters.

Plaintiff indicates he became aware that the bank, in violation of the State and Federal consumer credit and protection laws, "had intentionally and illegally overcharged customers on prepayment of their installment loans and intentionally did not make proper rebates." He claims he brought these matters to the attention of his superiors, the defendants Wilson and Schulte, who were vice-presidents of the bank.

Plaintiff alleges the defendant Wilson terminated his employment in June, 1975, but that he was reinstated a week later. In September of 1975, plaintiff contacted a member of the Board of Directors of the bank about the illegal practices, and was promised that an investigation would be made and that if illegal practices were found, they would be stopped. Shortly after this, according to the plaintiff, the defendant Wilson ordered employees to dispose of certain bank files that reflected the illegal practices.

On October 1, 1975, plaintiff was demoted from Office Manager of the Consumer Credit Department in what he claims was an effort to embarrass and humiliate him. He was thereafter subjected to threats and harassment by the defendant Wilson. The illegal practices continued.

---

[2] *Chapman v. Kane Transfer Co.*, ___ W. Va. ___, 236 S.E.2d 207 (1977).

Plaintiff states that in the early summer of 1976, he retained an attorney who contacted the Board member who plaintiff had originally seen about the problem. Thereafter, plaintiff furnished a list of approximately a dozen accounts which he claimed were improperly overcharged, so that the bank auditors could investigate the matters.

According to the plaintiff, in October, 1976, outside auditors were at the bank and thereafter some refunds were made to customers. In early November, 1976, the plaintiff and the defendant Wilson were invited to appear before a bank committee which was investigating the matter. At this meeting, plaintiff states a Director acknowledged that illegal practices had been found and that they would be stopped. Plaintiff was then reinstated to his position as Manager of the Consumer Credit Department.

Thereafter, in December, 1976, the defendant Schulte and the bank's auditor began to interview employees about the illegal transactions. On being informed that the investigation was confidential and refunds would be made, plaintiff gave the auditor certain files and informed him that he had retrieved them from wastebaskets. On December 30, 1976, plaintiff was summarily fired by the defendant Schulte with no reason given. However, plaintiff maintains that his discharge was solely in retaliation for his attempts to require the bank to comply with the laws of the United States and the State of West Virginia.

The plaintiff's second count incorporates the foregoing allegations from the first count and adds additional allegations that the defendant's conduct was extreme, malicious and outrageous, causing him to suffer severe emotional distress.

The chief defense asserted was that the plaintiff's employment was for no fixed term and therefore terminable at the will of either party, with or without cause. This undoubtedly is an established rule. *Wright v. Standard Ultramarine and Color Co.*, 141 W. Va. 368, 382, 90

S.E.2d 459, 468 (1955); *Adair v. United States*, 208 U.S. 161, 52 L. Ed. 436, 28 S.Ct. 277 (1908); *See* Annot., 62 A.L.R.3d 271 (1975).

However, the general rule does not dispose of the issue in this case. There is a growing trend that recognizes that an employer may subject himself to liability if he fires an employee who is employed at will if the employee can show that the firing was motivated by an intention to contravene some substantial public policy.

Two recent decisions of the Oregon Supreme Court serve to illustrate some of the principles involved. In *Nees v. Hocks*, 272 Ore. 210, 536 P.2d 512 (1975), plaintiff claimed she was fired for performing jury duty. The court, after citing several statutory and constitutional provisions relating to jurors, concluded there was a substantial public policy favoring jury duty and that the plaintiff had a cause of action against her employer.

In *Campbell v. Ford Industries*, 274 Ore. 243, 546 P.2d 141 (1976), the plaintiff sought to rely on the public policy theory when he was fired after exercising his statutory right as a corporate shareholder to examine his employer's books and records. The court refused to sustain his cause of action, holding that the statutory right to examine a corporation's books is not founded on any substantial public policy, but is designed as a protection of the private and proprietary interests of stockholders.

Pennsylvania has suggested it may recognize the doctrine of retaliatory discharge in *Geary v. United States Steel Corporation*, 456 Pa. 171, 319 A.2d 174 (1974). In speaking of the cases supporting the doctrine, it states:

> "It is not necessary to reject the rationale of these decisions in order to defend the result we reach here. In each case where a cause of action was found, the mandates of public policy were clear and compelling; that cannot be said of the instant case." [319 A.2d at 180, n. 16]

*Geary* involved an employee who contended that a pipe designed and manufactured by the defendant em-

ployer was unsafe and should not be marketed. When his immediate supervisors took no action, he took his complaint to their superiors. The complaint alleged that although the company ultimately withdrew the product, his firing was in retaliation for his complaints about the safety of the product.

Indiana and Michigan have utilized the doctrine to permit an employee to maintain an action where a claim is made that the firing occurred in retaliation for filing a workmen's compensation claim against the employer. In *Sventko v. Kroger Co.*, 69 Mich. App 644, 245 N.W.2d 151 (1976), and *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973), the courts reviewed their state workmen's compensation statutes and concluded their legislatures had expressed a strong public policy that workmen's compensation claims were not be to frustrated.

In *Jackson v. Minidoka*, 98 Idaho 330, 563 P.2d 54 (1977), the Idaho Supreme Court stated the doctrine in the following fashion, although it declined to apply it under the particular facts of that case:

> "As a general exception to the rule allowing either the employer or the employee to terminate the employment relationship without cause, an employee may claim damages for wrongful discharge when the motivation for the firing contravenes public policy." [563 P.2d at 57]

The Arizona Appeals Court also appears to recognize the doctrine, although it was found not applicable upon the facts presented to it in *Larsen v. Motor Supply Co.*, 117 Ariz. 507, 573 P.2d 907 (1977). There, two employees were discharged when they refused to take lie detector tests mandated by the company for all its employees.

The Washington Supreme Court has discussed the doctrine at some length, but determined it was not necessary to decide whether it would adopt the doctrine in *Roberts v. Atlantic Richfield Company*, 88 Wash.2d 887, 568 P.2d 764 (1977).

Two states have created a broader concept. In *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974), the court stated:

"We hold that a termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation is not in the best interest of the economic system or the public good and constitutes a breach of the employment contract." [114 N.H. at 133]

In that case, a female employee claimed she was fired because she refused to go out with her foreman. There was evidence that he had reassigned her to more menial jobs and also ridiculed her, causing the court to conclude that the jury was correct in finding "that the dismissal was maliciously motivated." The court considered the cause of action to arise out of the employment contract.

Massachusetts, following the *Monge* case, permits a breach of contract action to lie where there is a "bad faith" termination of an employment contract at will. *Fortune v. National Cash Register Co.*, 364 N.E.2d 1251 (Mass. 1977). In *Fortune*, a salesman was fired after some twenty-four years with the company after he claimed he was entitled to certain sales commissions. He asserted the firing was in "bad faith" because the company wanted to avoid paying the balance of the commissions due him. The court enunciated its rule as follows:

"We believe that the holding in the *Monge* case merely extends to employment contracts the rule that 'in *every* contract there is an implied convenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in *every* contract there exists an implied covenant of good faith and fair dealing.'" [364 N.E.2d at 1257] [Emphasis in original]

California dealt with the doctrine in *Petermann v. International Brotherhood of Teamsters*, 174 Cal. App. 2d 184, 344 P.2d 25 (1959), where a union employee was discharged when he refused to testify falsely before a

legislative committee. The court held that the strong public policy against perjury required that an employer be liable civilly to an employee discharged under such circumstances. In *Glenn v. Clearman's Golden Cock Inn,* 192 Cal. App. 2d 793, 13 Cal. Rptr. 769 (1961), several employees were discharged because they had applied for union membership. The court concluded that the state's statute giving employees an unfettered right to organize manifested a strong public policy that should give rise to a cause of action against an employer who discharged employees for joining a union.

The California Supreme Court approved and utilized the principle of *Petermann* and *Glenn* in *Schweiger v. Superior Court of Alameda County,* 90 Cal. Rptr. 729, 476 P.2d 97 (1970), where it authorized the defense of retaliatory eviction in a landlord's actions for ejectment, stating:

> "Both *Glenn* and *Petermann* persuasively instruct us that one may not exercise normally unrestricted power if his reasons for its exercise contravene public policy. Clearly, sections 1941 and 1942 express the policy of this state that landlords in the interest of public health and safety have the duty to maintain leased premises in habitable condition and that tenants have the right, after notice to the landlord, to repair dilapidations and deduct the cost of the repairs from the rent. The policy expressed in these sections cannot be effectuated if landlords may evict tenants who invoke the provisions of the statute. Courts would be withholding with one hand what the Legislature has granted with the other if they order evictions instituted in retaliation against the exercise of statutory rights."[3] [476 P.2d at 102]

---

[3] *Frampton v. Central Indiana Gas Company,* 260 Ind. 249, 297 N.E.2d 425 (1973), utilized as support for the retalitatory discharge doctrine the following cases holding that retaliatory evictions offend public policy, expressed in state health and building codes, where the tenant reports code violations, and is thereafter evicted by the landlord: *Edwards v. Habib,* 397 F.2d 687 (D.C. Cir. 1968);

There is substantial support from commentators for reformation of the rule of nonliability for employers on discharge of at will employees without regard to the circumstances surrounding the discharge.[4]

The question of whether we recognize an exception to the traditional rule is a matter of first impression in this jurisdiction. Some suggestion of the applicability of equitable principles can be found in *Chicago Towel Co. v. Reynolds*, 108 W. Va. 615, 152 S.E. 200 (1930). There, the court found inequitable the employer's firing of an at will employee "without notice and without excuse or attempted justification for its action." The employee had signed a covenant not to engage in the same business and the employer sought an injunction to prevent his employment with another linen company. This court dissolved the lower court's injunction based on the employer's inequitable discharge of the employee.

We conceive that the rule giving the employer the absolute right to discharge an at will employee must be tempered by the further principle that where the employer's motivation for the discharge contravenes some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by the discharge.[5]

---

*Schweiger v. Superior Court*, 90 Cal. Rptr. 729, 476 P. 2d 97 (1970); *Portnoy v. Hill*, 57 Misc.2d 1097, 294 N.Y.S.2d 278 (1968); *Dickhut v. Norton*, 45 Wis.2d 389, 173 N.W.2d 297 (1970); *Wilkins v. Tebbetts*, 216 So.2d 477 (Fla. App. 1968).

[4] Blades, *Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power*, 67 Colum. L. Rev. 1404 (1967); Blumberg, *Corporate Responsibility and the Employee's Duty of Loyalty and Obedience: A Preliminary Inquiry*, 24 Okla. L. Rev. 279 (1971); Blumrosen, *Settlement of Disputes Concerning the Exercise of Employer Disciplinary Power: United States Report*, 18 Rutgers L. Rev. 428 (1964); Weyand, *Present Status of Individual Employee Rights*, N.Y.U. 22nd Annual Conference on Labor 171 (1971); Note, *A Common Law Action for the Abusively Discharged Employee*, 26 Hastings L.J. 1435 (1975); Note, *Implied Contract Rights to Job Security*, 26 Stan. L. Rev. 335 (1974).

[5] Since this case is before us on a certified question solely on the issue of whether a cause of action exists, we do not reach the issue

Here, the plaintiff's complaint refers to intentional violations of W.Va. Code, 46A-1-1 *et seq.*, made by the defendants, which he endeavored to have stopped. This statutory provision is commonly known as the West Virginia Consumer Credit and Protection Act, W.Va. Code, 46A-1-101. We need not discuss the Act in detail in order to conclude that it represents a comprehensive attempt on the part of the Legislature to extend protection to the consumers and persons who obtain credit in this State and who obviously constitute the vast majority of our adult citizens.[6]

Not only did the Legislature regulate various consumer and credit practices, but it went further and established the right to civil action for damages on behalf of persons who have been subjected to practices that violate certain provisions of the Act. In addition, criminal violations are sanctioned for certain wilful violations. W.Va. Code, 46A-5-101 *et seq.*

Moreover, under Article 7 of the Act, the Attorney General is given broad powers to supervise, investigate and prosecute violations in order to see that compliance with the Act is maintained. Notwithstanding the broad grant of powers to the Attorney General, the Act still preserves the "remedies available to consumers under this chapter or under some other principles of law and equity." W.Va. Code, 46A-7-113.

We have no hesitation in stating that the Legislature intended to establish a clear and unequivocal public policy that consumers of credit covered by the Act were to be given protection. Such manifest public policy should not be frustrated by a holding that an employee of a lending institution covered by the Act; who seeks to ensure that compliance is being made with the Act, can

---

of the element of damages except to say the cause of action is one in tort and it therefore follows that rules relating to tort damages would be applicable.

[6] A rather full account of the history and scope of the West Virginia Consumer Credit and Protection Act is found in an article by that title by Professor Cardi in 77 W. Va. L. Rev. 401 (1975).

be discharged without being furnished a cause of action for such discharge.

We therefore conclude under the foregoing principles that as to the first count of the complaint, the certified question must be answered in the affirmative as a cause of action is stated.

As to the plaintiff's second cause of action, we observe that it seeks to recover damages for emotional injury as a result of the intentional, malicious and outrageous acts of the defendants. In *Monteleone v. Co-Operative Transit Co.*, 128 W. Va. 340, 36 S.E.2d 475 (1945), this Court set down certain principles in regard to mental and emotional injuries caused by the wrong of another:

> "First, those mental disturbances that accompany or follow an actual physical injury caused by impact upon the occurrence of the tort; second, where there is no impact and no physical injury at the time, but a physical injury afterwards results as the casual effect of a nervous shock which in turn was the proximate result of the defendant's wrong; and third, where there was no impact and no physical injury caused by the defendant's wrong, but an emotional or mental disturbance is shown to have been the result of the defendant's intentional or wanton wrongful act. In any of the foregoing classifications we believe that the plain weight of authority sustains a recovery." [128 W. Va. at 347]

The plaintiff's claim obviously falls within the third category. We have recognized this same principle, that emotional damages can be recovered for an intentional wrong, in a number of other cases. *Addair v. Huffman,* 156 W. Va. 592, 195 S.E.2d 739 (1973); *Sutherland v. Kroger Company,* 144 W. Va. 673, 110 S.E.2d 716 (1959); *Toler v. Cassinelli,* 129 W. Va. 591, 41 S.E.2d 672 (1946); *Lambert v. Brewster,* 97 W. Va. 124, 125 S.E. 244 (1924); *see Prince v. Pittston Company,* 63 F.R.D. 28 (S.D. W. Va. 1974); Annot., 64 A.L.R.2d 100 (1959).[7]

---

[7] The trial court viewed the second count to contain a cause of action for intentionally interfering with plaintiff's attempts to find

Finally, the individual defendants urge that as to them, the motion to dismiss was appropriate since it is the bank which is charged with violating the consumer credit and protection laws. We do not read the complaint that narrowly, since it fairly implies that both of the individual defendants, as well as the bank, were actively involved in the matters complained about. All the defendants are charged jointly with the allegation that the two individuals were acting within the scope of their employment. While the proof may exculpate one or all of the defendants, from a pure pleading standpoint the complaint was sufficient to withstand another to dismiss by the individual defendants. *Chapman v. Kane Transfer Co.*, W. Va., 236 S.E.2d 207 (1977).

For the reasons stated, the certified question is answered in the affirmative, that the complaint does state a valid cause of action in the first and second counts.

*Ruling on certified
question reversed.*

---

other employment, and for that reason did not dismiss this portion of the complaint. Because of the broad nature of the allegations in this count, coupled with the incorporation of the entire first count, we do not address the question of whether emotional distress arising solely from outrageous conduct, which conduct is not itself a tort, can be actionable. Restatement of Torts (2d) § 46; *Contreras v. Crown Zellerbach Corp.*, 88 Wash.2d 735, 565 P. 2d 1173 (1977); *Agis v. Howard Johnson Company*, 355 N.E.2d 315 (Mass. 1976).