426 S.E.2d 539

**James H. REED, Plaintiff Below, Appellant and Appellee,**

v.

**SEARS, ROEBUCK & COMPANY, INC., Defendant Below, Appellant and Appellee.**

**Nos. 20924, 20925.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 9, 1992.

Decided Dec. 18, 1992.

---

John A. Kessler, Hunt & Wilson, Ted M. Kanner, Forman, Kanner & Crane, Charleston, for plaintiff.

Steven C. Hanley, Kevin A. Nelson, Kay, Casto, Chaney, Love & Wise, Charleston, for defendant.

WORKMAN, Justice:

This case is before the Court upon the appeals of both James H. Reed and Sears, Roebuck & Company (hereinafter referred to as Sears) from the Circuit Court of Wood County. The Plaintiff, Mr. Reed, appeals from a denial by the trial court of a request to instruct the jury during trial on punitive damages and assigns as error the lower court's ruling that punitive damages were not recoverable in this case.[1] On March 7, 1991, the jury returned a verdict in favor of the Plaintiff on the issue of retaliatory discharge and awarded him damages for lost wages in the amount of $118,931 and damages for emotional distress in the amount of $250,275. The Defendant Sears also appeals from a July 1, 1991, order which denied post-trial motions for judgment notwithstanding the verdict or in the alternative, for a new trial. Sears contends that 1) the Plaintiff's evidence failed to establish a cause of action under West Virginia law for breach of an implied employment contract; 2) the trial court erred by finding that the Plaintiff had a valid cause of action under the theory of retaliatory discharge; and, 3) the trial court erred in not granting the Defendant a new trial on the Plaintiff's retaliatory discharge claim. Based upon a review of the record, the parties' briefs and arguments and all other matters submitted to this Court, we conclude that the trial court erred when it failed to hold, as a matter of law, that no warranty existed and that no implied contract of employment existed, instead leaving those questions to the jury.

1. Based on this Court's rulings regarding the implied employment contract and the retaliatory discharge claims, the punitive damages issue is rendered moot. It is important to note, however, that the trial court's conclusion that punitive damages were not recoverable as a matter of law was based specifically on the facts of this case and was not a general statement of the law with regard to punitive damages in a retaliatory discharge action. We find no error with the trial court's ruling on this matter.

Therefore, we reverse the decision of the circuit court.

On June 25, 1986, the Plaintiff, who was employed by the Parkersburg, West Virginia, Sears store as a service technician, went to the catalog store in Glenville, West Virginia, on a service call. Janet Deal, the owner and operator of the catalog store, had requested that Mr. Reed examine a Kenmore air conditioner and a dishwasher owned by the store that had been damaged in shipment. Mrs. Deal testified that after Mr. Reed examined the air conditioner, he informed her that the air conditioner had a broken casing and a broken fan motor. He estimated the repair cost on the service order at $350 and specifically stated that that estimate "does not include any seal system[2] repair that might be needed[.]" Further, Mrs. Deal's testimony indicated that Mr. Reed also orally informed her that the air conditioner had sustained too much damage and would cost too much to repair.

Based on this information, Mrs. Deal decided to junk the air conditioner for parts. Mrs. Deal later contacted management at the Parkersburg Sears store and offered the air conditioner for their use for spare parts. The Parkersburg Sears store declined to accept the air conditioner.

On July 10, 1986, Mr. Reed returned to the Sears catalog store in Glenville under instructions to pick up the dishwasher and the air conditioner, according to Mr. Reed's testimony at trial. Mrs. Deal testified that when Mr. Reed arrived at the store, he asked her if he could buy the air conditioner for parts. Mrs. Deal sold him the air conditioner for $26.25.[3] Because Mr. Reed would be transporting the air conditioner in his Sears' truck, he asked for a sales receipt as proof of purchase, according to Mrs. Deal's testimony. Mrs. Deal gave him the requested receipt and specifically noted the sale of an "Air conditioner for parts[.]"

In addition to that receipt, Mrs. Deal testified that she also completed a miscellaneous income form used by Sears to record monies received that were not part of a normal sale. On that form, Mrs. Deal described the sale as follows: "junked air conditioner sold for parts[.]" Mrs. Deal testified that had this been a regular customer transaction, she would have noted the customer's name and address on the receipt. She further stated that if a warranty accompanies the merchandise, she is required to list the name and address of the customer. She did not obtain that information from Mr. Reed during the sale of the junked air conditioner.

The Plaintiff took the air conditioner home and repaired the fan motor and the bent casing. Mr. Reed testified that after he made those repairs, the air conditioner functioned properly. Mr. Reed then indicated that he kept the air conditioner in his basement until August of 1987. At that time, he tested the unit again only to discover that the compressor was not working properly and needed to be replaced. On August 7, 1987, in his capacity as a Sears service technician, the Plaintiff placed an order for a new compressor under warranty. Additionally, according to Donna Poling, the parts manager, the Plaintiff sought an "emergency shipment" of the compressor which normally would have been paid by Sears.[4]

Troy Miller and Frank Dotson were the acting supervisors in the Parkersburg Sears Service Department in August 1987. Both men testified that their job duties included assisting service technicians in deciding whether appliances and/or parts were under warranty. Mr. Dotson testified that the normal procedure followed by a Sears employee making a warranty claim

---

**2.** The seal system contains the compressor which is at issue in this case.

**3.** Had the air conditioner not been damaged, the retail price would have been $500. Moreover, a new undamaged air conditioner was normally sold with two warranties. The first warranty covered the air conditioner as a whole and lasted for one year. The second warranty covered only the sealed system, which included the compressor, and lasted for a period of five years.

**4.** The Plaintiff testified that he told Ms. Poling that he was going to pay for the costs of the emergency order shipment; however, Ms. Poling had no recollection of this statement.

was the same as a normal customer. That procedure entailed presenting the merchandise to the front counter where another employee would fill out a service order and process it into the system. The employee could also call and have someone come to their home, but a service order was always filled out first. Moreover, Mr. Miller testified that the standard unwritten rule among the service technicians was that a technician would have a supervisor or service manager verify any warranty work for personal appliances or products. According to both Mr. Miller and Mr. Dotson, the Plaintiff did not comply with either of these procedures before ordering the $275 compressor.

Accordingly, it came to Mr. Miller's attention through other employees that the Plaintiff had ordered an air conditioner compressor by filling out a service order himself and by failing to seek approval from a supervisor since the order was purportedly under warranty. Concerned with the possible impropriety of Mr. Reed's conduct, Sears management undertook an investigation.

Mr. Reed testified that he learned from another service technician, Paul Dowler, that he was in trouble for ordering a compressor for his air conditioner. Consequently, the Plaintiff approached Frank Dotson who confirmed that there was a problem concerning the ordering of the compressor under warranty.

On August 15, 1987, the Plaintiff met with John Howland, the manager of the Parkersburg Sears store. The Plaintiff testified that he told Mr. Howland that he heard he was in trouble and that he wanted to explain the situation. The Plaintiff told Mr. Howland that he had a receipt for the purchase of the air conditioner. The Plaintiff also testified that he believed the compressor was covered by the five-year warranty even though he had purchased the air conditioner for parts. Mr. Reed then offered to do " 'anything it takes' " to keep his job, including destroying the unit.

Mr. Howland testified that he requested the Plaintiff to prepare a written statement regarding his version of what transpired. In his written statement, Mr. Reed stated that "[t]his air conditioner was purchased as a damaged appliance for parts" and that when he placed the order for the compressor he "honestly thought the compressor was under warranty since ... [he] had repaired the original problem & the compressor was not 5 years old." However, Mr. Reed also conceded that "[a]pparently this was a bad decision on my part & poor judgement [sic]. I did not intend to do anything dishonest." Significantly, other than the written warranty found in the air conditioner box after he first purchased the item, the Plaintiff offered no evidence that after he was approached by Mr. Howland he ever asserted that he had a valid warranty claim for the compressor.

Prior to receiving Mr. Reed's written account on August 17, 1987, Mr. Howland had conferred with Carl Blackburn, Sears' Regional Human Resources Manager, about the Plaintiff's situation. Because the Plaintiff had more than ten years [5] with the company, Sears company policy required Mr. Blackburn's approval before Mr. Reed could be terminated. At trial, Mr. Blackburn testified that, after discussing the Plaintiff's case with Mr. Howland, he concluded that Mr. Reed should be terminated. Specifically, Mr. Blackburn testified that Mr. Reed had acted dishonestly by attempting to obtain a $275 compressor under warranty for an air conditioner originally purchased for parts at a cost of $25. Mr. Reed was discharged from employment by Mr. Howland on August 17, 1987.

### BREACH OF IMPLIED CONTRACT OF EMPLOYMENT

The first issue before the Court is whether the Plaintiff's evidence established a cause of action for breach of an implied employment contract.[6] Sears maintains that the Plaintiff's evidence failed to establish a cause of action for breach of an implied contract. The Plaintiff, on the oth-

---

**5.** Mr. Reed had been employed with Sears for 17 years.

**6.** It is undisputed that there was never an express contract of employment.

er hand, asserts that select provisions contained in the "Getting Acquainted With Sears" booklet, with which the Plaintiff was provided when he was hired, constitute an implied contract under which he can only be discharged for good cause. The Plaintiff specifically refers to a section of the "Getting Acquainted With Sears" handbook entitled "Employment Rules." The Plaintiff asserts that he believed he could only be terminated if he violated one or more of the enumerated rules. That section, in pertinent part, provides: "[A]ny violation of the following rules may result in immediate termination of your employment: ... 2. Conclusive evidence of dishonesty, a misdemeanor, or an act indicating low moral standards."

In syllabus points 5 and 6 of *Cook v. Heck's Inc.*, 176 W.Va. 368, 342 S.E.2d 453 (1986), this Court held that:

A promise of job security contained in an employee handbook distributed by an employer to its employees constitutes an offer for a unilateral contract; and an employee's continuing to work, while under no obligation to do so, constitutes an acceptance and sufficient consideration to make the employer's promise binding and enforceable.

An employee handbook may form the basis of a unilateral contract if there is a definite promise therein by the employer not to discharge covered employees except for specified reasons.

However, this concept of an employee handbook forming an implied contract of employment was modified in *Suter v. Harsco Corporation*, 184 W.Va. 734, 403 S.E.2d 751 (1991).

In *Suter*, the plaintiff in applying for the position as a shipping clerk, acknowledged by her signature, the following disclaimer: " 'I UNDERSTAND AND AGREE THAT, IF HIRED, MY EMPLOYMENT IS FOR NO DEFINITE PERIOD AND MAY, REGARDLESS OF THE DATE OF PAYMENT OF MY WAGES AND SALARY, BE TERMINATED AT ANY TIME WITHOUT ANY PRIOR NOTICE.' " *Id.* at 736, 403 S.E.2d at 753. When hired, the plaintiff in *Suter* was given an employee handbook. While the employee handbook contained no specific list of offenses which would result in termination, there was some language which could have been interpreted as meaning that the employer would refrain from terminating an employee without cause after the employee's probationary period was completed. *Id.* at 736–37, 403 S.E.2d at 753–54 n. 2. The plaintiff was fired after a year and a half of employment. She later brought suit against Harsco Corporation for breach of an implied contract of employment for terminating her employment without cause. We reversed the trial court and held that the trial court should have concluded that, as a matter of law, the at will employment relationship was not modified by the employee handbook. *Id.* at 736, 403 S.E.2d at 753.

Particularly, in syllabus points 4 and 5 of *Suter,* we held that

An employer may protect itself from being bound by statements made in an employee handbook by having each prospective employee acknowledge in his employment application that the employment is for no definite period and by providing in the employment handbook that the handbook's provisions are not exclusive.

An employer may protect itself from being bound by any and all statements in an employee handbook by placing a clear and prominent disclaimer to that effect in the handbook itself.

*Id.* at 745, 403 S.E.2d at 752. Further, in *Adkins v. Inco Alloys International, Inc.,* this Court held that in order for a plaintiff to prove that an implied contract existed, "such claim must be established by clear and convincing evidence." Syl. Pt. 3, in part, 187 W.Va. 219, 417 S.E.2d 910 (1992).

It is also helpful in reaching a decision on this matter to examine the decision of the United States Court of appeals for the Sixth Circuit in *Reid v. Sears, Roebuck and Co.,* 790 F.2d 453 (6th Cir.1986). The Court in *Reid* was presented with the same argument made by the Plaintiff in the present case, essentially that the language in

the "Employee Rules" section of the "Getting Acquainted with Sears" handbook created an implied contract in which an employee could only be discharged for one of the listed causes or for some other good cause. *Id.* at 457.

The *Reid* court rejected the Plaintiff's argument by stating that

> We do not believe the listing of causes that 'may result in the termination of your employment' in the Sears handbook detracted in any way from the language in the application or provided a reasonable basis for the conclusion that the plaintiffs were employed under a 'for cause' contract. The fact that certain acts were identified as conduct that might lead to discharge did not indicate that these acts were the exclusive permissible grounds for discharge.

*Id.* at 460. Moreover, the Court in *Reid* referred to the fact that an employer under Michigan law, can defeat a claim by an employee that the employee can be terminated only for good cause by requiring the prospective employee to acknowledge when he is hired that he is an at-will employee. This is precisely what occurred in *Reid* when the plaintiffs signed an acknowledgement which contained "unequivocal" language to the effect that they were being hired as at-will employees. *Id.* at 461.

■ The evidence in the present case reveals that the Plaintiff's application for employment which he completed when he was hired by Sears contains the following pertinent language: "In consideration of my employment I agree to conform to the rules and regulations of Sears, Roebuck and Co., and my employment and compensation can be terminated, with or without cause, and with or without notice, at any time at the option of either the Company or myself...." Further, the following provision is located in the "Getting Acquainted With Sears" handbook:

> The information in this booklet covers many subjects and is necessarily very general in its nature. This information is intended only to acquaint you with the more important policies and programs of the company and, except for the paragraphs dealing with Vacations, is not to be construed as defining your rights or obligations thereunder.

Therefore, based upon our previous decisions in *Cook* and *Suter,* we conclude that a unilateral or implied contract of employment was not created based upon the employee handbook. Not only did the Plaintiff acknowledge that he could be terminated at any time with or without cause, but the handbook specifically contains a statement that it is "intended only to acquaint ... [the employee] with the more important policies and programs of the company," and with the exception of the "paragraphs dealing with Vacations, [it] is not to be construed as defining ... [the employee's] rights or obligations thereunder." Moreover, dishonesty was included in the employee handbook as a possible basis for termination. Accordingly, we concur with the Sixth Circuit's holding in *Reid* and conclude that the trial court erred in failing to direct a verdict on behalf of the Defendant Sears since the Plaintiff failed to establish his claim of a breach of an implied employment contract by clear and convincing evidence.

## RETALIATORY DISCHARGE

The next issue addressed by this Court is whether the trial court erred by finding that the Plaintiff had a valid cause of action under the theory of retaliatory discharge. The Defendant maintains that its requests for motions for directed verdicts should have been granted by the trial court because 1) the Plaintiff's attempt to obtain a compressor under warranty is not a matter of public policy sufficient to create a cause of action for retaliatory discharge and, 2) the Plaintiff failed to prove the intentional deprivation of an alleged statutory right necessary to his retaliatory discharge claim. The Plaintiff, however, contends that he was discharged in contravention of public policy because his termination was the result of his attempt to enforce warranty rights granted him by the West Virginia Consumer Credit and Protection Act, West Virginia Code §§ 46A–6–101 to –107 (1992).

In the syllabus point of *Harless v. First National Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978), we held that

[t]he rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge.

Consequently, in *Harless* this Court found that the plaintiff stated a cause of action against the defendants when he alleged in his complaint that he was discharged in retaliation for his efforts to bring to the attention of and require his employer to comply with federal and state consumer protection laws where the employer had been "'intentionally and illegally overcharg[ing] customers on prepayment of their installment loans and intentionally did not make proper rebates.'" *Id.* at 118, 246 S.E.2d at 272. Hence, we have already recognized that if an employee is discharged for attempting to enforce rights granted by the West Virginia Consumer Credit and Protection Act for the protection of all consumers of credit, a substantial public policy is contravened.

However, where a retaliatory discharge claim is based upon the assertion by the plaintiff that he was terminated due to his attempt to enforce warranty rights granted him pursuant to the West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A–6–101 to –107, the plaintiff has no basis for such a claim unless he can demonstrate that a valid warranty was created at the time of the sale of the goods. Therefore, it is apparent that the whole retaliatory discharge theory in this case hinges on whether a warranty actually existed on the compressor of the air conditioner purchased by the Plaintiff.

West Virginia Code § 46–2–313(1)(a) and (b) (1966) provides that

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.[7]

It is clear that West Virginia Code § 46–2–313(1)(a) and (b) mandates that an express warranty is created *only* when the affirmation of fact, promise or description of the goods is part of the basis of the bargain made by the seller to the buyer about the goods being sold.

There was no evidence presented before the trial court which would support the contention that an express warranty of any kind was created when the Plaintiff purchased the air conditioner for parts from the Sears catalogue store. Because it was clear as a matter of law that no warranty existed, the trial court erred in failing to grant the Defendant's motion for directed verdict on this issue. Without a valid warranty, the Plaintiff's cause of action for retaliatory discharge fails, since the motivation for the discharge cannot be said to have been based on the Plaintiff's attempt to enforce valid warranty rights.

Based on the foregoing opinion, the decision of the Circuit Court of Wood County is reversed.

Reversed.

---

**7.** It is important to note that the Plaintiff relied upon the existence of an express warranty. This is supported not only by Plaintiff's evidence, but also by the Plaintiff's jury instructions which only instruct the jury about the law concerning express warranties. It is clear that there is no support from which to argue the existence of an implied warranty of merchantability. *See* W.Va.Code § 46–2–314 (1966).